FILED

08/30/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0770

DA 14-0770

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 216

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

HILARIO MARTIN VELASQUEZ,

      Defendant and Appellant.

APPEAL FROM:     District Court of the Fifteenth Judicial District,
In and For the County of Roosevelt, Cause No. DC 13-37
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Chief Appellate Defender, Koan Mercer, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Pamela P. Collins, Assistant
Attorney General, Helena, Montana

          Ralph J. Patch, Roosevelt County Attorney, Jordan W. Knudsen, Deputy
County Attorney, Wolf Point, Montana

Submitted on Briefs: July 27, 2016

Decided: August 30, 2016

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Hilario Martin Velasquez was arrested for possession of drugs and drug paraphernalia in September 2013. He was jailed in Roosevelt County for over ten months while he awaited testing results from the State Crime Lab. Finally, at the end of July 2014, a Roosevelt County jury convicted Velasquez of both charges. The trial court rejected Velasquez's argument that he was denied a speedy trial. We reverse and remand for dismissal of the charges.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 Velasquez was riding in the back seat of a car that was stopped on September 25, 2013, when a law enforcement officer suspected the driver of being under the influence of alcohol or drugs. The arresting officer found crystals in a cigarette pack located on the dashboard between the driver and the front-seat passenger. The crystals field-tested positive for methamphetamine. Velasquez had a methamphetamine pipe in his pocket and admitted to smoking methamphetamine earlier that evening. The driver of the car also was arrested; the front-seat passenger, however, was not. Velasquez was charged with felony possession of a dangerous drug with intent to distribute, in violation of § 45-9-103, MCA, and with misdemeanor criminal possession of drug paraphernalia, in violation of § 45-10-103, MCA.

¶3 The District Court set trial for January 2014. Several weeks before trial, the State moved to continue the trial because the drug testing results were not yet complete and the State Crime Lab estimated nine months of backlog for drug analysis. Three days later,

2

the District Court ordered the continuance. Velasquez objected to the continuance, asserting his speedy trial right.

¶4 Trial was re-set for March 2014. The State moved for continuance on the same basis as before and the District Court granted its request. The court granted the State's third motion to continue in May 2014. About two weeks before the July 31 trial date, Velasquez moved to dismiss the case for lack of a speedy trial. Velasquez was unable post the $5,000 bail and remained in the Roosevelt County jail until trial. By then, he had been incarcerated for 309 days.

¶5 At the hearing on Velasquez's motion to dismiss, the court analyzed the alleged speedy trial violation under the factors articulated in *State v. Ariegwe*, 2007 MT 204, ¶¶ 106-12, 338 Mont. 442, 167 P.3d 815. The court concluded that the entire delay was institutional delay attributable to the State and that Velasquez had timely asserted his speedy trial right. The court determined, however, that although the question of prejudice was "close," it did not tip the balance in Velasquez's favor. The court orally denied Velasquez's motion and the case proceeded to trial. The jury found Velasquez guilty of both charges.

## STANDARD OF REVIEW

¶6 A speedy trial violation presents a question of constitutional law that we review de novo to determine whether the court correctly interpreted and applied the law. *State v. Zimmerman*, 2014 MT 173, ¶ 11, 375 Mont. 374, 328 P.3d 1132. We review the court's underlying factual findings for clear error. *Zimmerman*, ¶ 11. A finding is clearly erroneous "if it is not supported by substantial evidence, if the court misapprehended the

3

effect of the evidence, or if our review of the record convinces us that the court made a mistake." *State v. Brave*, 2016 MT 178, ¶ 6, 384 Mont. 169, ___ P.3d ___.

**DISCUSSION**

¶7 *Did the District Court err in denying Velasquez's motion to dismiss for lack of a speedy trial?*

¶8 A criminal defendant has a constitutional right to speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article II, Section 24 of the Montana Constitution. *Ariegwe*, ¶ 20. When an accused claims that right has been violated, we consider (1) the length of the delay, (2) the reasons for the delay, (3) the accused's responses to the delay, and (4) prejudice to the accused as a result of the delay. *Zimmerman*, ¶ 14. We balance these factors to determine whether the right to a speedy trial has been violated. *State v. Stops*, 2013 MT 131, ¶ 19, 370 Mont. 226, 301 P.3d 811. No single factor is dispositive; the factors are related and must be considered together with any other relevant circumstances. *Ariegwe*, ¶ 112. "[E]ach factor's significance will vary from case to case." *Ariegwe*, ¶ 105.

*(1) Length of the Delay*

¶9 We determine initially whether the length of the delay is at least 200 days, "which is the trigger date for conducting the four-factor balancing test." *Zimmerman*, ¶ 13. In this case, the District Court determined—and the parties agree—that the total length of the delay was 307 days, 107 days beyond the trigger date.[1] The longer the delay stretches beyond the 200-day trigger date, "the stronger the presumption is under Factor Four that

_____

[1] By our calculation, the length of the delay totaled 309 days, 109 days beyond the trigger date. We use that calculation in this Opinion.

4

the accused has been prejudiced by the delay, and the heavier the state's burden is under Factor Two to provide valid justifications for the delay." *Zimmerman*, ¶ 14 (citing *Ariegwe*, ¶¶ 49, 61).

¶10    In *Zimmerman*, we concluded that an 89-day delay beyond the trigger date did not substantially increase the State's burden or the presumption of prejudice. *Zimmerman*, ¶ 14; *accord State v. Charlie*, 2010 MT 195, ¶¶ 50, 59, 357 Mont. 355, 239 P.3d 934 (holding that a 70-day delay beyond the trigger date was not enough to "show a particularly compelling justification for the delay"). *But see State v. Billman*, 2008 MT 326, ¶ 18, 346 Mont. 118, 194 P.3d 58 (concluding that a 78-day delay beyond the trigger date "presents a considerable amount of delay, and we conclude that the State's justifications for the delay must be compelling and that it must make a persuasive showing that the delay did not prejudice Billman"). In *Ariegwe*, a 208-day delay beyond the trigger date required the State to "provide particularly compelling justifications for the delay under Factor Two; and under Factor Four, the State must make a highly persuasive showing that Ariegwe was not prejudiced by the delay, while the quantum of proof that may be expected of Ariegwe under this factor is correspondingly lower." *Ariegwe*, ¶ 123; a*ccord State v. Rose*, 2009 MT 4, ¶ 46, 348 Mont. 291, 202 P.3d 749 (holding that a 307-day delay beyond the trigger date "substantially" increased the State's burden under Factor Two, "the presumption that pretrial delay prejudiced Rose is increased, and the quantum of poof expected of Rose under Factor Four is substantially decreased").

5

¶11 The District Court did not address whether the extent of the delay increased the presumption of prejudice or the State's burden to justify the delay. Relying on *Zimmerman*, the State argues that the time elapsed days beyond the trigger date "is not particularly long" and therefore the State's burden and the presumption of prejudice are "relatively low." Velasquez contends that presumption of prejudice "is intensified" by the delay of more than 100 days beyond the trigger date.

¶12 Based on our case law we conclude that a 109-day delay beyond the trigger date occupies a middle ground between *Zimmerman* and *Ariegwe*. In other words, in this case, it increases the State's burden under Factor Two and Factor Four slightly more than it did in *Zimmerman*, but less than it did in *Ariegwe*. Accordingly, the State's burden to provide justifications for the delay in this case is higher, and the State must make a more persuasive showing that Velasquez was not prejudiced by the delay, "while the quantum of proof that may be expected of [Velasquez] under this factor is correspondingly lower." *Ariegwe*, ¶ 123.

*(2) Reasons for the Delay*

¶13 In considering the reasons for the delay, "we must identify each period of the delay, attribute the delay to the responsible party, and then assign weight to each period based on the specific cause and motive for the delay." *State v. Couture*, 2010 MT 201, ¶ 71, 357 Mont. 398, 240 P.3d 987. "The prosecution bears the burden of explaining pretrial delays." *Zimmerman*, ¶ 15. Delay caused by the State's bad faith weighs "heavily" against it. *Ariegwe*, ¶ 67. Delay caused by negligence or lack of diligence occupies a middle ground, but it still "'falls on the wrong side of the divide between

6

acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun.'" *Ariegwe*, ¶ 69 (quoting *Doggett v. United States*, 505 U.S. 647, 657, 112 S. Ct. 2686, 2693 (1992)). "[T]he more delay in bringing the accused to trial that is due to lack of diligence or other 'unacceptable' reasons, the more likely the accused's speedy trial right has been violated." *Ariegwe*, ¶ 72. Institutional delays are delays "inherent in the criminal justice system and caused by circumstances largely beyond the control of the prosecutor and the accused, such as overcrowded court dockets." *Couture*, ¶ 72. Institutional delay is attributable to the State, "but weighs less heavily against it than delay caused by bad faith, negligence, or lack of diligence." *Couture*, ¶ 72.

¶14 The District Court concluded that there "was no basis at all for delay caused by the defense" and that the entire delay was attributable to the State as institutional delay. The court noted, "It's the fact that the crime lab . . . is slow on getting things." The court observed also, "[W]hen I look at the way the crime lab is done, I think [the defense's] argument of negligence and lack of due diligence by the crime lab is a very good argument, but I don't know that it quite goes far enough for me to pull the trigger saying it's too far."

¶15 The parties do not dispute that the period of time from Velasquez's arrest to the first trial is attributable to the State as institutional delay. The State argues that the period of delay from the first originally scheduled trial date to the actual trial properly was classified by the District Court as institutional delay. Relying on *Ariegwe*, the State claims that a "delay from waiting for test results from the Crime Lab is institutional." Pointing out that the prosecution "had no control over when the Crime Lab would test the

substance," the State faults Velasquez for "wait[ing] until July 28, 2014, to suggest in the district court that the State should inquire about the backlog at independent laboratories."

¶16 Velasquez argues that the District Court erred in classifying all of the delay as institutional delay. He contends that "the 196-day delay between the originally scheduled trial date and the actual trial was caused by the State's lack of diligence." Velasquez suggests that as soon as the State learned that the crime lab would take nine months to conduct the drug testing, it should have pursued "alternative, timely testing," and that its failure "even to consider alternative testing sites" was negligent. "The State's choice to do nothing," Velasquez contends, "was not a circumstance beyond the prosecutor's control and is not mere institutional delay." Additionally, Velasquez argues that he had no duty to suggest the use of independent labs because "it is well settled that a defendant has no duty to advance his own prosecution."

¶17 In this case, we identify two periods of delay: (1) the 113-day delay between Velasquez's arrest and the first scheduled trial date and (2) the 196-day delay between the first scheduled trial date and the actual trial date. We agree with the parties that the first period of delay was institutional delay attributable to the State.

¶18 With respect to the second period of delay, keeping in mind that the State bears a higher burden to provide justifications for the delay, we conclude that the delay should be attributed to the State for lack of diligence. The prosecutor's constitutional obligation to try the defendant in a timely manner "requires a good faith, diligent effort to bring him to trial quickly." *Zimmerman*, ¶ 18. In *Ariegwe*, 28-day and 56-day periods of delay were the result of the defendant's motion to continue on grounds that the parties were still

8

waiting for test results from the crime lab. *Ariegwe*, ¶¶ 132-33. We concluded that such a delay was institutional. *Ariegwe*, ¶¶ 132-33. Another period of delay in *Ariegwe* resulted from the prosecution's motion to continue, which revealed that the motion "was necessitated by the State's delay in delivering evidence for testing at the crime lab." *Ariegwe*, ¶ 129. That delay, we concluded, was attributable to the State due to lack of diligence. *Ariegwe*, ¶ 129. We observed that the failure to provide discovery or send evidence to a crime lab in a timely manner "reflects a significant lack of diligence." *Ariegwe*, ¶ 154.

¶19 In the present case the State's inaction leads us to conclude that it was not diligent. The State was aware of the nine-month backlog at the crime lab by December 2013, when it first moved to continue Velasquez's trial. In January 2014, Velasquez raised concerns about how the testing delay might affect his speedy trial right. At the evidentiary hearing, a criminal investigator for the Roosevelt County Attorney's Office who had been working on Velasquez's case testified that when she emailed the crime lab to see if the drug testing had been initiated, she was "repeatedly told" that it would take nine months. Despite the State's awareness of the backlog and Velasquez's concerns, the record reveals no evidence that the State attempted to pursue any possible alternate testing locations after learning of and "repeatedly" confirming the nine-month delay. To be sure, the backlog at the State Crime Lab likely was "caused by circumstances largely beyond the control of the prosecutor." *Couture*, ¶ 72. But the failure to inquire into the availability of independent labs was squarely in the State's control. Mere allusion to crime lab backlog is not sufficient justification where the State has not investigated any

other options. *See State v. Fife*, 193 Mont. 486, 490, 632 P.2d 712, 715 (1981) ("Mere allusion to good faith misunderstanding and crowded court calendars is not sufficient justification where the State has not been diligent.").

¶20 The State's inaction in this case is similar to the State's failure to "send[ ] evidence to the crime lab in a timely manner." *Ariegwe*, ¶ 154. By simply accepting the nine-month delay and failing to potentially expedite the process by seeking out independent labs, the State showed dilatory inaction in moving the case toward trial. That Velasquez "wait[ed] until July 28, 2014, to suggest in the district court that the State should inquire about the backlog at independent laboratories" is immaterial. "[T]he accused is under no obligation to ensure diligent prosecution of the case against him, and has no duty to bring himself to trial." *Zimmerman*, ¶ 24 (internal citations omitted). The State knew for more than seven months that waiting for the results would cause significant delay in bringing Velasquez to trial. Had the prosecution inquired and determined that an alternate testing source was not reasonably available, the delay likely would be considered merely institutional. But its failure to even inquire falls beneath an acceptable threshold of diligence. We thus conclude that the 196-day delay between the first scheduled trial date and the actual trial date is attributable to the State and "falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun." *Ariegwe*, ¶ 69.

### (3) The Accused's Responses to the Delay

¶21 In evaluating the accused's responses to the delay, we consider the "totality of the accused's responses" to ascertain whether the accused "actually wanted" a speedy trial.

10

*Zimmerman*, ¶ 22. "[T]he issue is not simply the number of times the accused acquiesced or objected[;] [r]ather, the focus is on the surrounding circumstances." *Zimmerman*, ¶ 22.

> [T]here is no magical time for assertion of the right to a speedy trial which should be weighed more favorably to the defendant than some other time. So long as the defendant asserts his or her right to a speedy trial by a motion to dismiss on speedy trial grounds filed prior to the time of trial, we conclude that the defendant has satisfied the third-prong . . . and that further analysis of that prong is not only unnecessary, but inappropriate.

*Ariegwe*, ¶ 137 (citation omitted). "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Ariegwe*, ¶ 78 (citing *Barker v. Wingo*, 407 U.S. 514, 531-32, 92 S. Ct. 2182, 2192-93 (1972)). It "serves as a gauge of the weights the court should assign to the other three factors in the balancing." *Ariegwe*, ¶ 110.

¶22 Although the District Court concluded that Velasquez had affirmatively asserted his right to a speedy trial, Velasquez argues that the court "erred in not ascribing any weight to this factor." Velasquez emphasizes that he objected to the State's motion to continue in January, asserting his right to a speedy trial and "noting that he [had] already been incarcerated for 104 days." His objection, Velasquez contends, "put the State on notice, nearly a hundred days *before* crossing the 200-day speedy trial trigger, that he wanted a speedy trial and that the State's delaying his trial for the Montana State Crime Lab testing would violate his right to a speedy trial." Velasquez points out that he "never asked for a single continuance" and that "[n]one of the State's three motions to continue stated whether the State had contacted defense counsel concerning the motions or whether the defense agreed or objected to the continuances." Velasquez argues that his

11

"timely insistence" on a speedy trial "weighs heavily" in his favor with respect to this factor and "adds weight" in his favor to the other factors.

¶23 In its response to Velasquez's motion to dismiss, the State conceded that Velasquez had "timely asserted his right before the commencement of the trial, as required in *Ariegwe*." For the first time on appeal, however, the State argues that "[a]though he objected to a continuance early on, other circumstances indicate that Velasquez did not actually want to be brought to trial promptly."

¶24 It is well established that "a party may not raise new arguments or change its legal theory on appeal because it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider." *State v. Hendershot*, 2009 MT 292, ¶ 31, 352 Mont. 271, 216 P.3d 754 (citations and internal quotations omitted). Because the State conceded in the trial court that Velasquez had "timely asserted his right" under Factor Three, we decline to address its arguments with respect to this factor on appeal.

¶25 We conclude that the District Court determined correctly that Velasquez had asserted his speedy trial right. He objected to the State's first motion to continue and moved to dismiss the charges against him for lack of a speedy trial before proceeding to trial. That Velasquez did not object to the State's other two motions to continue is not surprising. The record reveals that both motions were filed on a Friday and granted the following Monday. Based on the "totality of [Velasquez's] responses," it is clear that he "actually wanted" a speedy trial. *Zimmerman*, ¶ 22.

12

¶26    We agree with Velasquez, however, that the court erred in failing to assign any weight to Factor Three. The District Court's comments on Factor Three were frugal: "As far as your assertion of your right, you guys asserted your right. I got no argument with that one." When balancing the factors the court did not consider Factor Three "together with the other three factors of the balancing test" as required by *Ariegwe*. *Ariegwe*, ¶ 79. The court referred only to Factors Two and Four: "[W]hen we get down, right down to the balancing, you know, the institutional delay doesn't get weighed very heavily. I don't know that the prejudices to the defendant outweigh that and make it so that I need to dismiss for lack of a speedy trial, but, boy, it's getting close." That Velasquez timely asserted his right, indicating that he actually wanted to be brought to trial, weighs in his favor and "is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right [to a speedy trial]." *Ariegwe*, ¶ 78.

*(4) Prejudice to the Accused*

¶27    Under Factor Four, we consider whether the delay prejudiced the accused "in light of the interests that the speedy trial right was designed to protect: (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern caused by the presence of unresolved criminal charges, and (iii) limiting the possibility that the accused's ability to present an effective defense will be impaired." *Zimmerman*, ¶ 28. The parties in this case dispute each of these interests.

### i. Oppressive Pretrial Incarceration

¶28    Whether pretrial incarceration is oppressive depends on the "particular circumstances," including "the duration of the incarceration, the complexity of the

charged offense, any misconduct by the accused directly related to his incarceration, and the conditions of the incarceration, such as overcrowding, recreational opportunities, adequate food, climate control, proper medical care, cleanliness, and legal research capabilities." *Couture*, ¶ 56. "[T]he length of the pretrial incarceration that is 'oppressive' is less for a relatively simple offense than it is for a complex charge." *Ariegwe*, ¶ 91; *accord Billman*, ¶ 41 (holding that a 278-day incarceration, coupled with the relatively simple charges of felony DUI and two misdemeanor driving offenses, established that the pretrial delay had prejudiced the defendant); *Couture*, ¶ 59 (concluding that a longer period of pretrial incarceration was justified due to the complexity of the charged offenses of deliberate homicide and tampering with evidence). When analyzing the conditions of incarceration, "we focus on the condition of the facilities and how they impact the accused, rather than solely on the condition of the accused." *Couture*, ¶ 62. "The question here is one of oppressiveness, not merely occasional unpleasantness." *Ariegwe*, ¶ 93.

¶29 The District Court concluded that Velasquez's pretrial incarceration was not oppressive because it was "clear" that he "would have been incarcerated otherwise [in California]" before the current violation "ever came up." Velasquez counters that it is "entirely speculative" whether he would have been incarcerated in California. Although his probation officer "may have been recommending incarceration," Velasquez contends that "there is no evidence in the record what sentence the California court would have actually imposed." Velasquez points out that he was "on the lowest level of supervision in California, and the California system has drug treatment alternatives to incarceration."

14

¶30 Velasquez argues that his 309-day incarceration at the Roosevelt County jail was in any event oppressive in both its duration and conditions. Velasquez emphasizes that "[f]rom October 2013 to April 2014, [he] was not allowed to go outside even once." Velasquez contends further that he was charged excessive amounts to make phone calls and had trouble sending mail from jail. The jail, Velasquez claims, contained "visible mold and recirculated air that made [his] lungs hurt." He claims also that the conditions of his incarceration caused him to develop a skin infection.

¶31 The State argues that the District Court correctly concluded that Velasquez otherwise would have been incarcerated in California for violations that occurred "a long time before this case arose." The State contends that while Velasquez's allegations about the jails may have been "[o]ccassionally disagreeable or unpleasant," they were "not sufficient to establish oppressive conditions." While the State acknowledges that Velasquez "did not go outside in the winter," it points out that Velasquez "went outside several times a week when the weather was better." The State argues further that Velasquez had "drinkable water from two sources," and that after seeing a doctor, Velasquez's skin condition had gotten better.

¶32 Upon review of the record, we conclude that the District Court's finding that Velasquez would have been incarcerated in California is not supported by substantial evidence. "Substantial evidence is evidence that a reasonable person might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Brave*, ¶ 6. At the hearing, Velsaquez acknowledged that he had received a letter a couple of months before the hearing,

15

notifying him of his alleged California probation violation and advising him of a future hearing date. Velasquez testified that after receiving the letter, he asked one of the guards at the jail to run a National Crime Information Center (NCIC) check and learned that any warrants for him "weren't extraditable." When the State questioned Roosevelt County criminal investigator Tierra Erwin, she testified that it was her "understanding" that California "did want [Velasquez] back." There was no indication, however, that California sought to extradite Velasquez. The State did not introduce evidence of a bench warrant for Velasquez, and Erwin admitted that to her knowledge there exists no judgment from California against Velasquez. Erwin acknowledged that when she searched the NCIC database at the time of Velasquez's arrest in September 2013, there was no warrant or detainer on Velasquez. The California probation officer's report of Velasquez's violation alleged that Velasquez had last reported to probation in January 2012; the probation violation report was filed in California in March 2014, and apparently was the first allegation of violation. The report showed that a March 2014 hearing date for the alleged probation violation had been extended to July 1, 2014—nearly ten months after Velasquez's arrest in Montana. Although the California probation officer recommended that Velasquez be "sentenced to the mid-term and it be served in any penal institution," Velasquez testified that he had never been actually incarcerated in California but had served house arrest for 174 days. Velasquez testified also that he believed there were other options besides incarceration available to him in California such as rehab.

¶33    We cannot conclude from our review of the evidence that there is more than a "mere scintilla" to support the District Court's finding. We conclude that a reasonable mind could not accept such evidence as adequate to support a finding that Velasquez would have been incarcerated in California even if he were not incarcerated in Montana. The court's factual finding with respect to this issue was clearly erroneous. And, even assuming some likelihood of Velasquez's imprisonment in California, "while the fact of incarceration on a separate charge is relevant [to the issue of oppressiveness], it is not dispositive." *Ariegwe*, ¶ 92.

¶34    The hearing evidence showed that Velasquez, jailed for ten months on a non-violent drug possession charge because he was unable to meet a $5,000 bail condition, was not allowed during at least half that time—five months—to step foot outdoors. He instead attempted to exercise within the confines of his jail cell but, with visible black mold inside the jail, Velasquez's "lungs hurt" when he tried to exercise. Jailers, when not busy with other tasks, would bring water to the inmates instead of requiring them to drink the water available in their cells, which Velasquez maintained was "not drinkable." Velasquez was unable to maintain consistent contact with his family, either because he could not afford the one-dollar-per-minute phone charges or because jailers had cut off all prisoner phone access when someone misbehaved. (There is no evidence that Velasquez was responsible for any loss of phone privileges.) And mail to his family, and even to his attorney, did not always get delivered.

¶35    We agree with Velasquez that the impact of the facility's conditions was more than "occasional unpleasantness." *Ariegwe*, ¶ 93. We conclude that the duration of

17

Velasquez's incarceration relative to the offense for which he was charged, combined with the conditions he endured at the Roosevelt County jail, support a finding that the circumstances of his incarceration were oppressive.

¶36 Considering the evidence in light of the intensifying presumption of prejudice created by the 309 days of delay, Velasquez has presented sufficient evidence of oppressive incarceration to meet his lowered quantum of proof.

### ii. The Accused's Anxiety and Concern

¶37 In assessing the accused's anxiety and concern, this Court focuses on "the ways in which the presence of unresolved charges disrupted the accused's life," keeping in mind that "[a] certain amount of anxiety and concern is inherent in being accused of a crime." *Couture*, ¶ 64. "[T]he crucial question here is whether the delay in bringing the accused to trial has unduly prolonged the disruption of his or her life or aggravated the anxiety and concern that are inherent in being accused of a crime." *Ariegwe*, ¶ 97.

¶38 In *Zimmerman* we concluded that a 289-day delay in bringing Zimmerman to trial unduly prolonged the disruption of his life and aggravated his anxiety and concern. *Zimmerman*, ¶ 34. We based our conclusion on the "clear causal connection between the State's failure to diligently prosecute the charges and Zimmerman's worsening financial situation, aggravated mental health issues, and increased stress in his family relationships." *Zimmerman*, ¶ 34.

¶39 The District Court found that most of Velasquez's anxiety and concern related to his absence from his family in California. In light of its finding that Child Protective Services already had taken Velasquez's son away and that Velasquez had failed to

18

complete the required treatment plan to get his son back, the court concluded that there could not be "that much anxiety and concern because [Velasquez] didn't seem to care enough to stay [in California] and get his treatment done."

¶40 Echoing the District Court's conclusion, the State emphasizes that Velasquez's son "was taken from him by Child Protective Services and [Velasquez] did not complete his treatment plan when he left drug rehab early." The State notes also that Velasquez left his son in California "six months before he was arrested in this case." The State points out that Velasquez did not lose his job because he was incarcerated in this case but that he had lost his job a month before he was arrested. The State relies on testimony from Velasquez's sentencing hearing to contend further that Velasquez's incarceration actually benefitted him.

¶41 Velasquez argues that the State's delay in bringing him to trial "*unduly prolonged* the disruption of his life or *aggravated* his anxiety and concern" because of "his inability to address his many financial, legal, and family matters while incarcerated in Montana." At the hearing Velasquez testified that his time in jail has been "really stressful" and that he had not been sleeping well. Velasquez explained that he was worried about "[a] lot of things. My [three-and-a-half-year-old] son, my life, getting back on track, just—mainly, my son." Velasquez admitted that Child Protective Services had taken his son and that he had not completed his treatment plan. He testified that before he left California, he had seen his son every weekend, but that because of his incarceration he has only been able to talk to his son "here and there" when he could afford a phone card. Velasquez takes issue with the State's reliance on sentencing hearing testimony to argue that his right to a

19

speedy trial was not violated. Velasquez points out that the sentencing hearing "occurred nearly two months *after* the evidentiary hearing" and therefore, the testimony was not before the District Court when it analyzed the speedy trial violation. Accordingly, Velasquez argues that the sentencing testimony "is not properly part of the speedy trial record" and should not be considered by this Court.

¶42 We agree with Velasquez that our review must be "confined to the record made before the district court" at the time of the speedy trial hearing. *Whitaker v. Farmhand, Inc.*, 173 Mont. 345, 357, 567 P.2d 916, 923 (1977). As Velasquez correctly points out, the sentencing hearing occurred well after the District Court had ruled on the speedy trial motion. It was certainly not presented to or part of the record made before the District Court. We therefore do not consider the State's arguments with respect to testimony presented at the sentencing hearing.

¶43 While we acknowledge that the pretrial delay may have caused Velasquez anxiety and concern, based on the record before us, we do not conclude that it rose to a level beyond that "inherent in being accused of a crime." *Couture*, ¶ 64. Here, unlike *Zimmerman*, the record does not reflect a "clear causal connection" between the State's failure to diligently prosecute the charges and Velasquez's financial and family issues. *Zimmerman*, ¶ 34. As the District Court noted, Velasquez had lost custody of his son and failed to complete his treatment plan well before he left California and became incarcerated in Montana. Likewise, Velasquez's struggles in obtaining or maintaining employment occurred before his arrest in this case. Velasquez testified that he had lost his job before his arrest because of "money that [he] owed in California" and because he

20

had a suspended driver's license. After losing his job but prior to his arrest, Velasquez testified that he had been looking for jobs "a little bit" but did not have a vehicle or driver's license in order to look for jobs.

¶44 We agree with the District Court that Velasquez did not present sufficient evidence to establish that the delay in bringing him to trial in this case caused undue prolonged disruption of his life or aggravated anxiety and concern beyond what any person accused of a crime would suffer.

### iii. Impairment of the Defense

¶45 Impairment of the defense "constitutes the most important interest in the prejudice analysis." *Zimmerman*, ¶ 36. It evaluates issues of evidence, witness reliability, and the accused's ability to present an effective defense. *Ariegwe*, ¶ 98. "[T]ime may erode the accuracy of witness testimony and exculpatory evidence," *State v. Jefferson*, 2003 MT 90, ¶ 36, 315 Mont. 146, 69 P.3d 641, and "pretrial delay prejudices an accused if defense witnesses are unable to accurately recall past events," *Billman*, ¶ 47 (citation omitted). Because "excessive delay presumptively compromises the reliability of trial in ways that neither party can prove," "consideration of prejudice is not limited to the specifically demonstrable." *Ariegwe*, ¶ 99 (quoting *Doggett*, 505 U.S. at 655, 112 S. Ct. at 2692-93) (internal quotations omitted). "[I]n the absence of affirmative proof that the delay has impaired the accused's ability to present an effective defense, impairment must be assessed based on other factors in the analysis." *Ariegwe*, ¶ 100.

> A speedy trial claim likely would fail if the government had pursued the accused with reasonable diligence and the accused could not show specific prejudice to his or her defense as a result of the delay. Conversely, where

21

the government has been negligent in bringing the accused to trial, such negligence is not automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him.

*Zimmerman*, ¶ 36 (citations and quotations omitted).

¶46 The District Court noted that a missing witness—the front-seat passenger from the vehicle in which Velasquez was arrested—had been located very close to the hearing date. The court observed, however, that "nobody really ever said what [the witness] would say or wouldn't say to me that would make it seem that she was so important or not so important. I have no clue what she would say from everything that I read."

¶47 Although the front-seat passenger was subpoenaed close to his trial date, Velasquez points out that the defense was not in touch with her at the time of the hearing and that she was "missing or unwilling to appear by the time of trial." "While the record may not directly establish whether [the witness] would have been available at the original trial date," Velasquez argues that he has made "at least some showing of a missing, exculpatory witness." Velasquez refers to the defense investigator's hearing testimony that the front-seat passenger "had previously made allegations to police regarding [the driver's] actions in the vehicle." Velasquez argues also that he presented evidence at the evidentiary hearing that other witnesses had experienced diminished memories due to the delay. In any event, Velasquez argues that "affirmative proof of specific defense impairment is not essential to every speedy trial claim."

¶48 The State argues, "There was no evidence that Velasquez's defense was impaired by the delay" because "[n]o evidence was presented that if the trial were sooner, [the front-seat passenger] would have been located and would have appeared," and "no

22

evidence or indication of what [the witness's] testimony would be." In addition, the State claims that the District Court found that the delay "worked in Velasquez's favor because it allowed him more time to try to locate [the witness]."

¶49 We disagree that the delay "worked in Velasquez's favor" and note that the District Court did not draw such a conclusion. The court stated,

> As far as the limit the possibility the defense has, I kind of want to be a smart alec and say, it looks like now they've found the lost witnesses, you're actually ahead by the delay as opposed to being behind. Although, it's also [the State's] witness they found, so *I don't know whether that's a win or not.*

(Emphasis added.) With respect to a showing of defense impairment, the record reflects that Velasquez made some showing of prejudice at the evidentiary hearing. The investigator for the defense testified that a couple of the police officers who were involved in the case had "some recollection difficulties" when he interviewed them. As Velasquez points out, the investigator testified also that the front-seat passenger witness had made "some specific allegations" against the driver of the vehicle. While such evidence may not be "specifically demonstrable," it is part of our consideration of prejudice. *Ariegwe*, ¶ 99.

¶50 Finally, even "in the absence of affirmative proof that the delay has impaired [Velasquez's] ability to present an effective defense," we look to other speedy trial factors to inform our analysis. *Ariegwe*, ¶ 100. As we determined in Factor One, the State must make a more persuasive showing that Velasquez was not prejudiced by the delay, "while the quantum of proof that may be expected of [Velasquez] under this factor is correspondingly lower." *Ariegwe*, ¶ 123. In Factor Two, we determined that the

23

196-day delay between the first scheduled trial date and the actual trial date is attributable to the State's lack of diligence in failing to consider alternative testing options. Such lack of diligence "is not automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *See Zimmerman*, ¶ 36. In considering the evidence of impairment in light of the other factors, we conclude that Velasquez was prejudiced by the delay.

*Balancing*

¶51 In balancing the four factors in the analysis, we hold that the delay in this case establishes a constitutional speedy trial violation. The length of the delay intensified the presumption of prejudice to Velasquez and increased the State's burden to prove valid justifications for the delay. The pretrial delay due to the State's inaction toward obtaining timely drug-testing was an unacceptable reason for postponing Velasquez's trial, making it "more likely [that his] speedy trial right has been violated." *Ariegwe*, ¶ 72. Velasquez's response to the delay in timely asserting his speedy trial right weighs further in his favor and should have been considered in the balancing equation. *Ariegwe*, ¶ 110. The District Court found Factor Four to be a close call, but concluded that the prejudice Velasquez suffered did not tip the scales sufficiently to demonstrate a violation of his speedy trial right. But because the District Court gave no weight to Velasquez's assertion of his right, and because we have determined that the State bears a heavier burden in this case to overcome the presumption of prejudice, we conclude that the scales do tip in Velasquez's favor.

**CONCLUSION**

¶52    In the final analysis, the guarantee of a "speedy" trial rings hollow when a person too poor to afford bail sits in jail for nearly a year on a non-violent, straightforward, relatively minor drug possession charge, confined for half that time without one minute outside, and cut off in large measure from his distant family—all because the State did not attempt to determine more quickly whether the car in which he was riding in fact contained illegal drugs.

¶53    Velasquez did not receive protection of his constitutional right to a speedy trial. We therefore reverse the District Court's denial of his motion to dismiss and remand for dismissal of the charges.


                                                    /S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON