FILED

04/22/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0213

DA 23-0213

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 77

IN THE MATTER OF:

L.S.,

    A Youth Under the Age of Eighteen.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DJ-21-068(B)
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Jay Reno, Jay Reno, PLLC, Sequim, Washington

    For Appellee:

    Austin Knudsen, Montana Attorney General, Brad Fjeldheim,
Assistant Attorney General, Helena, Montana

    Travis Ahner, Flathead County Attorney, Kalispell, Montana

Submitted on Briefs:  February 26, 2025

Decided:  April 22, 2025

Filed:

_____
Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1 L.S. appeals an order of the Montana Eleventh Judicial District Court, Flathead County, denying his motion to dismiss an allegation of sexual assault for lack of a speedy trial. We address the following restated issue:

> *Whether the District Court erred when it denied L.S.'s motion to dismiss for lack of speedy trial.*

We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 On or about October 25, 2019, Khrysta Turk contacted the Kalispell Police Department to report that she had discovered her stepson, L.S., then 13 years old, had been inappropriately touching her four-year-old daughter, E.T., who had told Khrysta that L.S. put his mouth on her bottom. When the Kalispell Police interviewed L.S., he admitted to touching E.T. inappropriately, specifically that he put his hands down her pants and "felt around." Further investigation led to E.T.'s disclosure of previous inappropriate touching by L.S.

¶3 The day L.S.'s stepmother, Khrysta, reported the allegations to Kalispell Police, L.S.'s mother, Stephanie, removed L.S. from his father and stepmother's house and, later that night, took him to the emergency room after he made suicidal comments relating to self-harm. The next day, Stephanie voluntarily placed L.S. in a residential treatment facility, Pathways Treatment Center, in Kalispell for a period of 52 days.[1] On the advice

---

[1] L.S.'s 52-day stay at Pathways Treatment Center started October 26, 2019, and ended December 17, 2019.

of medical professionals at Pathways, Stephanie again voluntarily placed L.S. in another treatment facility, Coastal Harbor Treatment Center in Savannah, Georgia, for a period of 260 days.[2] The investigation concluded in December 2019, and the matter was referred to the Eleventh Judicial District Court Office of Youth Services on or about January 3, 2020. A probation officer with the Youth Court contacted the County Attorney regarding the matter.

¶4 On January 6, 2020, the Youth Court contacted L.S.'s mother to determine how it would proceed next. This contact revealed that L.S.'s mother had already placed him in a residential treatment facility and that she was seeking treatment for L.S. in connection with his past and current behaviors. Given L.S.'s residential placement, the Youth Court decided to monitor L.S.'s treatment informally and forgo preliminarily investigating the matter or starting an informal disposition. Although the Youth Court maintained contact with L.S., his family, and various residential treatment service providers beginning in early 2020, it did not formally proceed against L.S. or require his placement in any of the facilities where he resided during the next approximately two years.

¶5 On September 4, 2020, after successfully completing his treatment at Coastal Harbor, L.S. was referred to a step-down facility, Sequel TSI of Idaho, where he again was voluntarily placed and remained for 342 days.[3] While L.S. initially did well in the step-down program, he began exhibiting behavioral issues, demonstrating assault and

---

[2] L.S.'s 260-day stay at Coastal Harbor Treatment Center started December 17, 2019, and ended September 4, 2020.

[3] L.S.'s 342-day stay at Sequel TSI started September 4, 2020, and ended August 12, 2021.

3

physical aggression toward peers and staff, elopement attempts, property destruction, and self-harm attempts. L.S. was then transferred to his final treatment center, Piney Ridge Treatment Center in Fayetteville, Arkansas, for a period of 159 days, where he engaged in similar negative behaviors.[4] Piney Ridge subsequently discharged L.S. due to noncompliance with his therapy and aggression towards others.

¶6 On January 3, 2022, while L.S. was still at Piney Ridge, the State filed a formal petition for a delinquent youth, alleging that L.S. committed acts consistent with felony sexual assault in violation of § 45-5-502, MCA. On the same date, L.S. was appointed counsel, and counsel made its first discovery request. On January 11, 2022, the District Court issued an order to take L.S. into custody, and the State had L.S. transported from Piney Ridge to the Cascade County Regional Youth Services Center in Great Falls. On February 4, 2022, the District Court held an initial adjudication hearing, where L.S. denied the allegations set forth in the petition. The District Court set a jury trial for July 18, 2022, but later moved it to July 11, 2022.

¶7 On numerous dates in 2022, the State sent discovery to L.S., but when the State filed its first witness and exhibit list on June 7, 2022, it listed a Serology Report that it had not previously sent to L.S. On June 20, 2022, L.S. moved to compel discovery of the Serology Report, which the State sent the next day. On July 1, 2022, L.S. moved for a continuance because of the newly discovered information and requested a discovery sanction. The District Court rescheduled the trial to September 12, 2022.

---

[4] L.S.'s 159-day stay at Piney Ridge Treatment Center started August 12, 2021, and ended January 18, 2022.

¶8    On July 26, 2022, L.S. filed two motions to dismiss, one for lack of speedy trial and the other for the discovery violation relating to the State's failure to provide the Serology Report earlier in the proceedings.  On August 12, 2022, the District Court released L.S. from detention to live with his grandmother under specified conditions.  The District Court heard both motions to dismiss on August 19, 2022, and denied them on September 2, 2022. In its order, the District Court noted that his case was not typical, as L.S.'s mother had proactively placed him in an inpatient treatment facility before the Youth Court Services had received the report of his sexual assault.  Further, the District Court concluded that none of the professionals involved in this case had conducted themselves in a manner geared or intended to deprive L.S. of his substantive rights.  The District Court, however, did not conduct a speedy trial analysis in denying L.S.'s speedy trial motion.

¶9    The District Court vacated the September 12, 2022, trial due to other matters having priority, and reset it to December 19, 2022.  During a hearing on November 28, 2022, L.S. entered an admission to the sexual assault allegations pursuant to a written agreement with the State but reserved his right to appeal the denial of his motions.  At the dispositional hearing, on January 13, 2023, the District Court placed L.S. on formal probation until age 18 (or up to 21 if necessary to complete conditions).  L.S. appeals.

**STANDARD OF REVIEW**

¶10    "The violation of a defendant's right to a speedy trial is a question of constitutional law which requires that we review a district court's decision to determine if it is correct."[5]

---

[5] Although the Court used the word "defendant" in *A.G.*, juveniles in Youth Court are referred to as "youth" or "juvenile"; they are not referred to as "defendant."

*In re A.G.*, 2002 MT 111, ¶ 17, 309 Mont. 491, 47 P.3d 831, 834 (citing *State v. Haser*, 2001 MT 6, ¶ 17, 304 Mont. 63, 20 P.3d 100).

¶11　This Court reviews a district court's denial of a motion to dismiss for lack of speedy trial to determine whether the court's factual findings were clearly erroneous. *State v. Ariegwe*, 2007 MT 204, ¶ 119, 338 Mont. 442, 167 P.3d 815.

## DISCUSSION

¶12　*Whether the District Court erred when it denied L.S.'s motion to dismiss for lack of speedy trial.*

¶13　The Sixth and Fourteenth Amendments of the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee the right to a speedy trial. *State v. Butterfly*, 2016 MT 195, ¶ 8, 384 Mont. 287, 377 P.3d 1191. Juveniles facing delinquency proceedings enjoy the same rights as adults under Article II, Section 15, of the Montana Constitution. *A.G.*, ¶ 19. The speedy trial analysis requires balancing four factors: (1) length of delay, (2) reasons for delay, (3) accused's response to delay, and (4) prejudice to the accused resulting from delay. *Ariegwe*, ¶¶ 106-113*; Butterfly*, ¶ 8. When analyzing the delay, the Court balances these factors "with any other relevant circumstances to determine whether the right to a speedy trial has been violated." *Butterfly*, ¶ 8 (quoting *State v. Stops*, 2013 MT 131, ¶ 19, 370 Mont. 226, 301 P.3d 811). The significance of each factor varies from case to case based on the relevant circumstances. *Butterfly*, ¶ 8 (quoting *Ariegwe*, ¶ 105).

### a. Factor One – Length of Delay.

¶14　A delay that exceeds 200 days triggers a speedy trial analysis. *A.G.*, ¶ 21. In matters relating to a youth court proceeding, the clock for a speedy trial begins to run when the youth becomes an "accused." *A.G.*, ¶ 21 (citing *State v. Daniels*, 248 Mont. 343, 348-49, 811 P.2d 1286, 1289 (1991)). "It is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Ariegwe*, ¶ 42 (quoting *United States v. Marion*, 404 U.S. 307, 320, 92 S. Ct. 455, 463 (1971)). While an accused does not need to wait for an indictment, information, or other formal charge to invoke the protections of the Sixth Amendment in the context of a speedy trial violation, the protection does not extend to the period before arrest. *Marion*, 404 U.S. at 321, 92 S. Ct. at 463-64.

¶15　L.S. argues that the District Court erred when it failed, in its speedy trial analysis, to account for the 728 days that he spent at various residential treatment facilities between January 6, 2020, when the State decided to handle L.S.'s case informally, and January 3, 2022, when the State filed the formal petition against him, asserting that those days were spent under the State's informal administration of his case. L.S. contends that the procedural rules the Youth Court Act mandates are different from adult criminal procedures and that the speedy trial trigger should not apply rigidly to juvenile proceedings. As such, L.S. asserts that, for purposes of calculating time under a speedy trial analysis,

1,057 days elapsed between January 6, 2020[6], and November 28, 2022, when he admitted the allegations of sexual assault, resulting in an extraordinary length of delay. The State, however, argues that the length of delay was 329 days (January 3, 2022, when the State filed the formal petition, to November 28, 2022, when L.S. admitted the allegations) because L.S. was not formally accused for purposes of a speedy trial analysis until January 3, 2022, when the State filed the formal petition alleging L.S. engaged in conduct that would be sexual assault if committed by an adult.

¶16     When the report of L.S.'s conduct was sent to the Youth Court on January 3, 2020, L.S. was already at a treatment facility where his mother had voluntarily placed him. The record shows that the Youth Court made no preliminary inquiry pursuant to § 41-5-1201, MCA, and initiated no statutory informal disposition pursuant to § 41-5-1301, MCA. Rather, while L.S. was receiving treatment at the various treatment centers, the Youth Court decided against pursuing any statutory action in this case as it waited to see how L.S. would respond to treatment. Once it was determined that L.S. was no longer responding to treatment, the State filed its Petition, on January 3, 2022, alleging that L.S. was a delinquent youth by virtue of alleged conduct that would be felony sexual assault pursuant to § 45-5-502, MCA, if committed by an adult. L.S.'s mother's voluntary actions and the State's reluctance to take any action while waiting for L.S. to complete treatment successfully cannot be counted toward the length of delay in this case, as the State took no

---

[6] This is the date on which the Youth Court probation officer contacted L.S.'s family and learned that his mother voluntarily placed him in treatment, and the Youth Court decided to monitor his progress.

action to place L.S. in any of the treatment centers he attended. As such, the period of delay in this case is 329 days; it starts at the filing of the formal petition against L.S. and ends with his admission of the allegations in the formal delinquency.

¶17 The next step when analyzing the length of delay is the extent to which the delay exceeds the 200-day trigger date. *Ariegwe*, ¶ 107. The further the delay exceeds the 200-day trigger date, "the stronger the presumption is under Factor Four that the accused has been prejudiced by the delay, and the heavier the state's burden is under Factor Two to provide valid justifications for the delay." *State v. Velasquez*, 2016 MT 216, ¶ 9, 384 Mont. 447, 377 P.3d 1235 (quoting *State v. Zimmerman*, 2014 MT 173, ¶ 14, 375 Mont. 374, 328 P.3d 1132). While substantial, the delay was not extraordinary given the serious nature of the allegations involving sexual assault against a minor in L.S.'s father's home. *See State v. Couture*, 2010 MT 201, ¶ 59, 357 Mont. 398, 240 P.3d 987. Here, the delay of 129 days beyond the trigger date occupies a middle ground in our case law that burdens the State to provide a higher, but not compelling, justification for the delay, while L.S.'s burden is correspondingly lower. *Velasquez*, ¶ 12. *See also Zimmerman*, ¶ 14; *Ariegwe*, ¶ 123.

**b. Factor Two – Reasons for the Delay.**

¶18 Under factor two, the first step is to identify each period of delay. *Zimmerman*, ¶ 15. The Court must attribute each period of delay to the appropriate party and assign weight based on the specific cause and culpability of the delay. *State v. Chambers*, 2020 MT 271, ¶ 10, 402 Mont. 25, 474 P.3d 1268; *Ariegwe*, ¶ 124. Delay due to negligence by government actors will be weighed more heavily against the State than valid reasons for

the delay and institutional circumstances. *Chambers*, ¶ 10. Delay due to the inherent nature of the criminal justice system is considered an institutional circumstance, which weighs less heavily than intentional attempts by the State to delay trial. *State v. Steigelman*, 2013 MT 153, ¶ 15, 370 Mont. 352, 302 P.3d 396.

¶19 The first period of delay (179 days) occurred between the day the State filed its petition against L.S., January 3, 2022, and the day L.S. requested a continuance, July 1, 2022. L.S. and the State agree that this delay was institutional, thus weighing slightly against the State. The second period of delay (73 days) occurred between L.S.'s request for continuance and the September 12, 2022, trial date. The parties agree that the delay was attributable to L.S.; however, L.S. argues that it was necessary because the State negligently failed to provide the Serology Report within the timeframe the District Court set for discovery and the delay should weigh lightly, if at all, against him. Failure to send discovery does put the other party in a disadvantageous position, and the State admits it was negligent in failing to send the report, therefore the second period weighs moderately against the State. *Ariegwe*, ¶¶ 66-67. The third delay period (77 days) was from the September trial date until L.S. admitted the allegations in the State's petition on November 28, 2022. The parties agree that this delay was institutional, weighing minimally against the State–less heavily than delay caused by bad faith, negligence, or lack of diligence. *Butterfly*, ¶ 31. Of the 329 days of delay, 256 days are attributable to the State as normal institutional delay, which weigh slightly against the State, whereas 73 days weigh moderately against the State due to its negligence in failing to send all required discovery.

### c. Factor Three – The Accused's Response to the Delay.

¶20 Under the third speedy trial factor, we evaluate the accused's response to the delay, for example the acquiescence in, or objection to, the pretrial delay. *Couture*, ¶ 50; *Ariegwe*, ¶ 110. The primary focus of the analysis under the third factor is on the circumstances surrounding the accused's response, not merely the number of times the accused acquiesced or objected. *Couture*, ¶ 50. We consider the "totality of the accused's responses" to determine whether the accused "actually wanted" a speedy trial. *Butterfly*, ¶ 32 (quoting *Zimmerman*, ¶ 22).

¶21 L.S. requested an expedited trial at his initial adjudicatory appearance on February 4, 2022, roughly one month after the State filed the delinquency petition against him; and he never waived his speedy trial right. L.S. first formally asserted his speedy trial right on July 26, 2022, in his motion to dismiss for lack of speedy trial. L.S. argued his right to speedy trial during the August 2022 evidentiary hearing on his motions to dismiss for lack of speedy trial and discovery abuse and in a written argument following the evidentiary hearing. At an October 14, 2022 pretrial hearing, L.S. again asserted his right to speedy trial. However, as the trial date neared, during the October 14, 2022 pretrial hearing, L.S.'s counsel admitted that this case would not likely go to trial. Accordingly, on November 28, 2022, L.S. admitted the allegations against him. L.S. consistently asserted his speedy trial right. However, his simultaneous request for a continuance and motions aimed at dismissal, combined with an acknowledgement six weeks before his admission that the case would not likely go to trial, reflect strategic use rather than genuine intent to expedite trial. *See Couture,* ¶ 54. Thus, this factor weighs against L.S.

11

### d. Factor Four – Prejudice to the Accused.

¶22 When analyzing factor four, we consider whether the delay prejudiced the accused "in light of the interests that the speedy trial right was designed to protect: (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern caused by unresolved criminal charges, and (iii) limiting the possibility that the accused's ability to present an effective defense will be impaired." *Butterfly*, ¶ 34 (quoting *Zimmerman*, ¶ 28).

#### i. Preventing Oppressive Pretrial Incarceration.

¶23 The determination of whether pretrial incarceration was oppressive depends on the particular circumstances of the incarceration. *Couture*, ¶ 56. Factors considered in determining whether pretrial incarceration was oppressive include the duration of incarceration, the complexity of the charged offense, any misconduct by the accused directly related to the incarceration, and the conditions of the incarceration. *Couture*, ¶ 56.

¶24 L.S. was detained at a youth detention facility in Great Falls from January 3, 2022, until August 12, 2022, for a period of 206 days. The 206 days of detention was lengthy but necessary given the complexity and serious nature of the allegations and the safety concerns for L.S.'s minor siblings. Because L.S. did not show oppressive detention conditions, his detention was not oppressive.

#### ii. Anxiety and Concern.

¶25 A certain amount of anxiety and concern is inherent in criminal proceedings. Also, the speedy trial guarantee is designed to shorten the disruption to the accused's life, not to eliminate it altogether. Accordingly, the critical question is whether the delay in bringing

the accused to trial unduly prolonged the disruption of his life or aggravated the anxiety and concern that are inherent in being accused of a crime. *Zimmerman*, ¶ 32.

¶26 L.S. argues that the placements exacerbated his major depressive disorder, instances of self-harm and anxiety, and deprived him of a sense of home, family, or positive support. However, L.S.'s time at the treatment centers cannot be attributed to the State in a speedy trial analysis because L.S.'s mother, not the State, placed him there. Also, L.S. provided no substantial evidence demonstrating extraordinary anxiety or mental harm directly linked to delays the State caused. *See Ariegwe*, ¶ 97. Once L.S. was in State custody at the youth detention center, L.S.'s behavior improved to the extent that he had no further reported behavioral issues. As such, we cannot find that the time L.S. spent in State detention increased his anxiety or concern.

### iii. Impairment of the Defense.

¶27 Impairment of the defense "constitutes the most important interest in the prejudice analysis." *Velasquez*, ¶ 45 (quoting *Zimmerman*, ¶ 36). Under this interest, the Court considers issues relating to evidence, witness reliability, and the accused's ability to present an effective defense. *Zimmerman*, ¶ 35. Because excessive delay presumptively compromises the reliability of a trial when it cannot be proven or even identified, a failure to make an affirmative showing that the delay weakened the ability to raise a specific defense, elicit specific testimony, or produce specific evidence does not preclude a finding that the defense has been impaired. *Zimmerman*, ¶ 35. Generally, however, a speedy trial claim fails when the State pursues a case with reasonable diligence and the accused cannot show that the delay impaired his or her defense accordingly. *Ariegwe*, ¶ 60.

13

¶28    L.S. did not present evidence that the delay impaired his defense.  Moreover, a careful review of the record reveals no prejudice to L.S.'s defense.  Therefore, factor four weighs significantly against L.S.

### e.  Balancing.

¶29    When balancing these factors, we must determine whether the claimant was deprived of his right to a speedy trial based on the unique facts and circumstances of the case and weigh each factor together along with other circumstances that may be relevant.  *Couture*, ¶ 98; *Ariegwe*, ¶ 113.  The length of delay here was 329 days, 129 passed the trigger date for a speedy trial analysis, which weighs in L.S.'s favor and creates a moderate burden for the State to prove valid justification for the delay.  In looking at the reasons for delay, we determine that the delays were all either normal institutional delays in relation to the State or due to L.S.'s request for a continuance, which ultimately lightly weighs in L.S.'s favor.  L.S. did assert his right to a speedy trial numerous times over the course of his detention, but he failed to show that the delay prejudiced him.  Ultimately, L.S.'s failure to demonstrate prejudice, oppressive pretrial delay, increase in anxiety or concern, and impairment of his defense weighs against a speedy trial violation.  Most of L.S.'s argument is centered around the time he spent in voluntary residential treatment centers, which cannot be attributed to the State.

¶30    Considering all factors, the moderate length of delay and institutional delays weigh slightly against the State.  However, L.S.'s inconsistent assertion and lack of demonstrated prejudice, especially no impairment of defense, weigh significantly against finding a

14

speedy trial violation. Thus, balancing all relevant factors, no speedy trial violation occurred.

## CONCLUSION

¶31    Based on the explicit *Ariegwe* analysis provided here, we affirm the District Court's denial of L.S.'s motion to dismiss for lack of speedy trial.

¶32    Affirmed.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE