FILED

10/25/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0015

DA 21-0015

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 212

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

WILLIAM LOWREY HESSE,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Twentieth Judicial District,
In and For the County of Lake, Cause No. DC-2019-246
Honorable Jason Marks, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellant Defender, Haley Connell Jackson, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Bree Gee, Assistant
Attorney General, Helena, Montana

          Steven N. Eschenbacher, Lake County Attorney, Brendan McQuillan,
Deputy County Attorney, Polson, Montana

Submitted on Briefs:  August 31, 2022

Decided:  October 25, 2022

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     William Hesse appeals his criminal convictions in the Twentieth Judicial District Court, Lake County, for Deliberate Homicide and Tampering with or Fabricating Physical Evidence.  Hesse argues that the State's 391-day delay in bringing his case to trial violated his right to a speedy trial and the charges should be dismissed.  In the alternative, he seeks a new trial with a properly selected jury panel after the District Court authorized the Clerk of Court to excuse prospective jurors without the court's approval of each excuse.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     On August 31, 2019, William Hesse attacked and killed his roommate, Gyme Kelly, at the Mission Meadows Camping and RV Park near Ronan, Montana.  Lake County Sheriff's Deputy Ross Holcomb, along with several other law enforcement officers, responded to the incident and arrested Hesse.  Lake County charged Hesse with two felonies, Deliberate Homicide and Tampering with or Fabricating Physical Evidence.  Hesse's original trial date was set for March 30, 2020.  He was not brought to trial, however, until September 25, 2020—391 days after his arrest.

¶3     Hesse filed two motions to dismiss for lack of speedy rial while he awaited trial.  He filed the first motion on April 21, 2020; the District Court denied it eleven weeks later in a twenty-five-page written order.  Hesse renewed the motion on September 1, 2020.  The District Court orally denied the renewed motion on September 28, 2020, at the beginning of the second day of trial.

¶4     In preparation for Hesse's trial, the District Court directed the Clerk of Court, Lyn Fricker, to summon a larger-than-usual number of prospective jurors in anticipation of an increased excusal rate due to the COVID-19 pandemic. Fricker accordingly sent summonses to a computer-generated, representative list of 150 prospective jurors. The District Court, relying on this Court's April 27, 2020 Directive asking trial courts to excuse jurors at high risk for contracting COVID-19 or who had other appropriate reasons not to report for jury duty, instructed Fricker to excuse all jurors who requested it. Fricker did so, excusing 59 jurors. Hesse moved to strike the jury panel and impanel a new jury on the basis that Fricker excused prospective jurors without individual court approval and thus violated Montana law. The District Court heard testimony from Fricker before trial and denied Hesse's motion.

¶5     At the conclusion of a seven-day trial, the jury convicted Hesse of both charges. The District Court sentenced him to concurrent prison terms of eighty and ten years on the respective counts and awarded credit for time served.

## STANDARDS OF REVIEW

¶6     We review for clear error the factual findings underlying a district court's speedy trial ruling. *State v. Houghton*, 2010 MT 145, ¶ 13, 357 Mont. 9, 234 P.3d 904. We review de novo a district court's conclusions of law about a speedy trial violation. *Houghton*, ¶ 13. Finally, we review for correctness a district court's denial of a motion to strike the jury panel. *State v. LaMere*, 2000 MT 45, ¶ 14, 298 Mont. 358, 2 P.3d 204.

**DISCUSSION**

¶7 On March 12, 2020, then-Governor Steve Bullock declared a state of emergency in Montana due to the outbreak of the COVID-19 pandemic. By March 20, Governor Bullock had closed schools and businesses and suspended nursing home visits. On March 27, 2020, this Court ordered trial courts across the state to suspend all criminal jury trials until after April 10, 2020, in order to slow the spread of the virus. We explained that, because "the serious danger posed by COVID-19 is good cause to continue criminal jury trials, and constitutes an unavoidable circumstance, the time between the date of this order and the date of the next scheduled trial date are considered institutional delay when calculating time for trial." On April 27, 2020, we directed trial courts to comply with several precautionary public health measures and renewed these requirements on May 22, 2020. Hesse's original trial date, March 30, 2020, landed squarely in this period of closures and upheaval.

¶8 *1. Did the State's delay in prosecuting William Hesse violate his right to a speedy trial?*

¶9 The fundamental right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article II, § 24, of the Montana Constitution. *State v. Ariegwe*, 2007 MT 204, ¶ 20, 338 Mont. 442, 167 P.3d 815. Courts use the four-factor *Ariegwe* balancing test to determine if a criminal defendant's right to a speedy trial has been violated. They consider the length of delay, the reasons for delay, the accused's responses to the delay, and prejudice to the accused. *Ariegwe*, ¶ 113.

**Factor One: Length of Delay**

¶10 Courts engage a speedy trial analysis if the interval between a criminal accusation and trial is at least 200 days. *Ariegwe*, ¶ 107. Hesse's trial began 391 days after his arrest, so the District Court's analysis properly continued.[1]

¶11 Courts next consider the extent to which the delay stretches beyond the 200-day trigger date. *Ariegwe*, ¶ 107. The presumption that pretrial delay has prejudiced the accused intensifies over time, and the State's burden to justify the delay becomes heavier the longer the delay. *Ariegwe*, ¶ 107. Here the District Court correctly determined that the delay stretched 191 days beyond the 200-day trigger date.

**Factor Two: Reasons for Delay**

¶12 Courts next identify and attribute to the appropriate party each period of delay. *Ariegwe*, ¶ 108. Any delay not caused by the defendant is attributed to the State by default. *Ariegwe*, ¶ 108. Courts also assign weight based on the reason for the delay. *Ariegwe*, ¶ 108. Institutional delays, such as overcrowded court dockets, weigh less heavily against the State than do deliberate or negligent delays. *Ariegwe*, ¶ 108. Delays for valid reasons, such as particularly complex charges or missing witnesses, serve to justify appropriate

---

[1] The District Court did not enter a written order when it denied Hesse's renewed motion, which included new argument about the final period of delay stretching from July to September 2020. We reviewed the record and conclude that, considering the analysis in its first speedy trial order, the District Court impliedly found when it orally denied the renewed motion that Hesse had not made an additional showing of a speedy trial violation due to the ensuing three-month period. *See State v. Gable*, 2015 MT 200, ¶ 18, 380 Mont. 101, 354 P.3d 566 (describing our doctrine of implied findings for purposes of reviewing findings of fact).

5

delay and are weighed least heavily against the State. *Ariegwe*, ¶ 70 (citing *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972)).

¶13     We agree with the District Court that all five periods of delay in prosecuting Hesse's case should be attributed to the State. The State first caused a brief six-day delay by filing the case in Lake County Justice Court rather than directly in the District Court. The second delay occurred when the District Court initially set Hesse's trial for March 30, 2020 (a delay of 207 days). The District Court had a busy docket in the interim; the delay thus was institutional and properly weighed less heavily against the State. Next, the District Court continued the trial to July 6, 2020, due to the COVID-19 pandemic (a delay of 99 days). The District Court reasoned that it would be irresponsible at that time to gather a large number of people for a trial and acted in accordance with our March 27, 2020 Order to suspend jury trials. Fourth, the District Court caused a 21-day delay when it continued Hesse's trial to July 27, 2020, because of its backlogged docket after resuming trials. Fifth and finally, the District Court caused a 67-day delay when it continued the trial to September 25, 2020, due to a significant increase in COVID-19 cases in Lake County and concerns that the shelter-in-place order issued by the Confederated Salish and Kootenai Tribes would prevent a proper cross-section of the community for Hesse's jury panel. The District Court properly concluded that the delays related to COVID-19 in this case were institutional delays and thus weighed only minimally against the State.[2]

---

[2] Hesse includes in his briefing the fact that on March 6, 2020, the State requested a continuance to secure a blood spatter expert. The District Court, however, never ruled on this request; the court continued the trial due to the pandemic. As such, we decline to include the State's request for continuance in our speedy trial analysis.

6

**Factor Three: Accused's Responses to Delay**

¶14    Courts next evaluate the accused's responses to the delay to determine whether the accused "actually wanted a speedy trial, which in turn informs the inquiry into whether there has been a deprivation of the right." *Ariegwe*, ¶ 110.  Hesse twice asserted his right to a speedy trial, once in April 2020 and again four months later.  He thus clearly evidenced his desire for a speedy trial, and this factor weighs against the State.

**Factor Four: Prejudice to the Accused**

¶15    For the final factor, courts assess whether a defendant was prejudiced by the delay in light of three interests: (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern caused by the presence of unresolved criminal charges, and (iii) limiting the possibility that the accused's ability to present an effective defense will be impaired.  *Ariegwe*, ¶ 111.

### i. Preventing oppressive pretrial incarceration

¶16    Courts consider whether pretrial incarceration was oppressive in light of all of the circumstances of the incarceration.  *Ariegwe*, ¶ 111.  Lengthy pretrial incarceration is considered less oppressive when a defendant faces complex charges, rather than simple ones.  *Ariegwe*, ¶ 91.  Conditions of incarceration, such as overcrowding, lack of health care, or limited legal research capabilities, make it more likely that pretrial incarceration was oppressive.  *Ariegwe*, ¶ 93.  Courts must "focus on the condition of the facilities and how they impact the accused, rather than solely on the condition of the accused." *State v. Velasquez*, 2016 MT 216, ¶ 28, 384 Mont. 447, 377 P.3d 1235 (quoting *State v. Couture*, 2010 MT 201, ¶ 62, 357 Mont. 398, 240 P.3d 987).

¶17 Hesse describes several concerning conditions of his pretrial incarceration. He lacked private communication with counsel at the Lake County Jail, and for three months at the beginning of the pandemic he was limited to phone communication with counsel. Hesse asserts that the State withheld DNA and serology evidence, slowing his defense efforts. He asserts that the pretrial delay aggravated his mental health issues and that he was denied proper mental health care and medication. Another person incarcerated in the Lake County Jail attempted suicide in the cell next to Hesse's, which caused Hesse mental anguish. Finally, Hesse lived "in constant fear of contracting and dying from the virus."

¶18 The District Court concluded that Hesse's pretrial incarceration did not rise to the level of oppression. First, Hesse's charges were complex. We concluded in *Couture* that a 924-day period of pretrial incarceration was justified due to the complexity of the charged offenses of deliberate homicide and tampering with evidence. *Couture*, ¶ 59. The State was prosecuting Hesse for the same serious charges, and the law tolerated a longer delay. Important here, the District Court explicitly remedied two of Hesse's complaints when it ordered Lake County Jail to provide private communication with counsel and ordered the State to disclose the DNA and serology evidence. The District Court also attempted to ameliorate conditions by ordering Hesse's transfer to the Missoula County Detention Facility. Hesse has not shown clear error in the District Court's findings that Hesse was not denied adequate medical care when he was prescribed his bipolar medication, though not Adderall, and that the Lake County Jail took reasonable precautions to prevent the spread of COVID-19. Reviewing all of the circumstances, we agree with the District Court that Hesse's pretrial incarceration was not oppressive.

8

### ii. Minimizing anxiety and concern caused by the presence of unresolved criminal charges

¶19 The District Court determined that the delay in bringing Hesse to trial did not unduly prolong the disruption of his life or aggravate the anxiety and concern that are inherent in being accused of a crime. *Ariegwe*, ¶ 111.

¶20 Hesse's briefing fails to connect his feelings of anxiety to his unresolved charges. As the District Court noted, Hesse's cited anxiety appears to have been associated with contracting COVID-19, more than it was derived from the presence of unresolved charges. Hesse provides no evidence that being publicly accused of two serious felonies and his trial occurring six months later than originally scheduled prolonged the disruption in his life beyond the inherent disruption that results from being accused of a crime and held in jail. We agree with the District Court that the disruption to Hesse was not unduly prolonged.

### iii. Limiting the possibility that the accused's ability to present an effective defense will be impaired

¶21 The District Court was required to consider whether the delay weakened Hesse's ability to "raise specific defenses, elicit specific testimony, or produce specific items of evidence." *Ariegwe*, ¶ 111. Impairment of the defense is the most important factor in our prejudice analysis. *State v. Steigelman*, 2013 MT 153, ¶ 29, 370 Mont. 352, 302 P.3d 396.

¶22 Hesse argued that the deaths of two witnesses prior to his trial—Deputy Holcomb and Reserve Officer Van Meter (a Lake County Sheriff's Department Reserve Officer who had, with a team of others, catalogued evidence from the crime scene)—impaired his defense. The District Court concluded that their deaths did not impair Hesse's defense because both officers were accompanied by other officers who were able to testify at trial

about their observations. The District Court observed that the loss of Deputy Holcomb as a witness arguably helped Hesse's case because Hesse had made an inculpatory statement to Holcomb that Hesse could have challenged as lacking foundation after Holcomb's death.

¶23 We conclude, as did the District Court, that the fourth factor, addressed in the three subsections above, does not demonstrate prejudice to Hesse and thus weighs in favor of the State.

**Balancing the Factors**

¶24 When balancing the four factors, the court must consider them together and "with such other circumstances as may be relevant." *Ariegwe*, ¶ 112. We agree with Hesse that the outbreak of the COVID-19 pandemic and this Court's precautionary directives did not confer a free pass to the government to ignore speedy trial protections. But we examine all speedy trial claims on a case-specific basis. Here, where Hesse was brought to trial six months after his original trial date, where the delay was primarily institutional under the specific conditions presented at that time by the unprecedented COVID-19 pandemic, and where Hesse failed to demonstrate prejudice to his defense, we conclude that Hesse was not denied his right to a speedy trial.

¶25 *2. Did the District Court err in denying Hesse's motion to strike the jury panel?*

¶26 Montana law allows potential jurors to be excused from jury service if jury service would entail undue hardship. Section 3-15-313(1), MCA, provides in pertinent part, "The court or the jury commissioner with the approval of the court shall excuse a person from jury service upon finding that jury service would entail undue hardship for the person, a dependent of the person, or the public served by the person." Subsection (2) allows the

10

court "or the jury commissioner with the approval of the court" to excuse a prospective juror upon affidavit of undue hardship. Section 3-15-313(2), MCA. The clerk of court serves as the jury commissioner. Section 3-15-404(1), MCA. Courts and jury commissioners must substantially comply with jury-selection procedures because the procedures are rooted in the constitutional right to a trial by an impartial jury. *LaMere*, ¶ 32. The purpose of the statutes is to eliminate arbitrariness in the jury-selection process and thus to ensure a fair cross-section of the community. *LaMere*, ¶ 38.

¶27 Hesse argues that Fricker violated § 3-15-313, MCA, when she excused potential jurors without receiving individualized approval from the court. Hesse cites as support our conclusion in *State v. Highpine* that a clerk failed to substantially comply with jury-selection procedures when she did not follow up with personal service of notice upon those who failed to respond to their summonses. 2000 MT 368, ¶¶ 39-41, 303 Mont. 422, 15 P.3d 938. The clerk in *Highpine* instead contacted non-responding jurors by telephone and did not attempt any contact with those who had listed no phone number. *Highpine*, ¶ 39. Highpine presented evidence that nearly one-third of all Native American households had no telephone and therefore were disproportionately excluded by phone notification of jurors for Highpine's trial. *Highpine*, ¶ 40. Hesse contends that Fricker's actions here likewise resulted in Native Americans, as well as seniors, being excluded from his jury.

¶28 Under the circumstances of this case, we conclude that the District Court did not err when it denied Hesse's motion to strike the jury panel. Fricker acted at the direction of the District Court to gather a larger-than-usual pool of jurors and to excuse all jurors who requested it, given the public health dangers posed by the pandemic. In doing so, both the

11

District Court and Fricker operated under this Court's April 27, 2020 Directive (which had been reinforced by our May 22, 2020 Directive). Along with other precautionary practices, those directives asked courts to excuse "jurors in advance who may be at high-risk or have other appropriate reasons to not report (lack of childcare, caring for a high-risk person, etc.)." Although Fricker excused some jurors for reasons not apparently related to the pandemic (e.g., being out of town), she excused jurors mostly for pandemic-related reasons—experiencing fatigue or headache, being at high risk of contracting the virus, lacking childcare, or caring for a high-risk or sick person. Her excusals thus constituted substantial compliance with Montana's jury-selection requirements.

¶29 Finally, the record does not demonstrate that Hesse's jury panel was an improper cross-section of the community. Fricker drew the 150-person panel randomly. It included both Native Americans and seniors. *Highpine* is inapposite because in that case the Clerk's departure from statutory procedures affected the random nature of the jury-selection process. *See Highpine*, ¶ 40. Here, the conditions existing at the time justified broad leeway in relieving prospective jurors from their summonses, and Fricker—under the District Court's instruction—followed appropriate public health guidance as directed by this Court in excusing individual members from the panel. Hesse did not have a right to have any particular persons on his jury, but a right to jury panel that represented a fair cross-section of the community, which he received. *LaMere*, ¶ 37.

¶30 The jury-selection statute demands "substantial" compliance with its terms. *LaMere*, ¶ 32 (quoting *State v. Landry*, 29 Mont. 218, 223-24,74 P. 418, 420 (1903)). Such compliance secures "a just and impartial administration of the jury system." *LaMere*, ¶ 32

12

(quoting *State v. Diedtman*, 58 Mont. 13, 18, 190 P. 117, 118-19 (1920)).  In the face of grave public health dangers at the time in question, this Court's express directives, and the Clerk's testimony that she excused jurors based on those guidelines, we hold that the District Court correctly concluded that Hesse's jury panel was "drawn in substantial conformity with the requirements of the statute."  *LaMere*, ¶ 32 (quoting *Landry*, 29 Mont. at 223-24, 74 P. at 420).

## CONCLUSION

¶31    The District Court correctly denied both of Hesse's motions to dismiss for lack of speedy trial and his motion to strike the jury panel.  His convictions are affirmed.


/S/ BETH BAKER


We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE

13