FILED

05/20/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0257

DA 23-0257

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 106

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

PAUL KERMIT GYSLER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC-21-288(B)
Honorable Robert B. Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator,
Kristina L. Neal, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

          Travis Ahner, Flathead County Attorney, Andrew Clegg, Deputy
County Attorney, Kalispell, Montana

                  Submitted on Briefs:  May 7, 2025

                        Decided:  May 20, 2025

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Paul Kermit Gysler appeals his Flathead County jury conviction of felony assault on a peace officer and resulting Eleventh Judicial District Court judgment. He raises the following issues:

1. *Did the pretrial delay violate Gysler's constitutional right to a speedy trial?*

2. *Did the District Court err in instructing the jury on resisting arrest when Gysler was not charged with that offense?*

3. *Did the District Court improperly instruct the jury on justified use of force when it gave a first-aggressor instruction?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 On July 17, 2021, Whitefish Police Officer Chase Garner confronted Gysler after observing him urinating in public around 2:30 AM. Gysler asserts that Officer Garner approached him aggressively, causing Gysler to fear for his safety and act in self-defense. The State asserts that Gysler became agitated and assaulted Officer Garner. It is undisputed that Officer Garner "hip-checked" Gysler during the encounter and tackled him to the garage pavement. Gysler then pinned Officer Garner down until he tased Gysler, a passerby pulled Gysler off, and other officers arrived and arrested him. On July 20, 2021, the State filed its Information charging Gysler with felony assault on a peace officer. Gysler posted bond on July 22, 2021.

¶3 On July 28, 2021, because Gysler was arrested separately on an unrelated matter, the District Court issued an arrest warrant for violating his conditions of release. The State's petition to revoke included police report statements from Gysler's parents that they

had bonded Gysler out to get mental health treatment, but he was in a mental breakdown and refused to go to treatment. On September 9, 2021, the court granted Gysler's motion for release on his own recognizance so that he could receive treatment at a Billings facility. In December 2021, Wolf Point Police arrested Gysler for various charges, including driving under the influence. The State filed a petition to revoke his release in Flathead County, and the District Court issued another warrant for his arrest.

¶4      The District Court set trial for February 22, 2022. At a status hearing on February 7, 2022, Gysler's private counsel informed the court that Gysler had terminated his services, and he was withdrawing as counsel. Gysler asserts the termination was because his attorney wanted him to accept a plea and Gysler wanted to go to trial. Gysler addressed the court at the status hearing, and the prosecution raised concerns about his fitness to proceed, especially if Gysler was going to represent himself. At the close of the status hearing, the court ordered that the matter would remain set for trial on February 22, 2022. On February 11, 2022, the court ordered a competency evaluation at the Montana State Hospital (MSH) for an examination period not exceeding 60 days. Citing § 46-14-202, MCA, the court stated that Gysler's "conduct and behavior at the status hearing [gave] rise to grave concerns" by the court on his fitness to proceed. The court vacated the trial. On February 22, 2022, the court appointed a public defender to represent Gysler. The public defender, who had been in the courtroom during the February 7 status hearing, filed a motion a week after his appointment to set aside the fitness issue absent a contested hearing and to proceed with a jury trial. He contested the adequacy of the court's evidence, stated

3

that he did not see any indication of unfitness during the February 7 hearing, further stated that Gysler appeared competent and rational in their consultations together, and argued that the delay would violate Gysler's speedy trial right. The State did not respond to the motion.

¶6 The court (on its own motion) held another status hearing on April 28, 2022. At the April 28 hearing, the District Court reiterated its concerns for Gysler's fitness to proceed due to his behavior at the previous hearing. It explained that prior to its order, the court reviewed the statute and determined that it could, sua sponte, request a mental competency determination. The State shared the court's concerns and mentioned that some of Gysler's family members had reached out to the prosecutor's office with similar concerns about Gysler's mental health and competency. The State anticipated that Gysler would be transported to MSH within the next two to four weeks. Counsel for Gysler continued to argue against the evaluation and requested that the matter go to trial. Counsel cited speedy trial concerns, argued that Gysler was in custody, and contested the validity of the comments by family members. Defense counsel stressed that both he and Gysler were ready for trial and that Gysler was competent and able to review the evidence and assist counsel. He requested trial within the next two weeks. Counsel also explained that he retained a private mental health evaluator to meet with Gysler to demonstrate competency. The court stated that it would review the private evaluation once completed and reconsider the MSH evaluation order. Gysler then addressed the court at length, requesting the case be dismissed due to numerous allegations, including speedy trial violations, collusion, racketeering, coercion, prejudice, and malicious prosecution.

¶8     The record reveals no notice to the court or any further mention of the private health evaluation ostensibly obtained by the defense. MSH admitted Gysler for the fitness evaluation on May 10, 2022, issued the evaluation less than two months later, and determined that Gysler was fit to proceed.[1] Gysler returned to the Flathead County Detention Center. Gysler filed a motion to set trial as soon as possible; the court set the case for September 12, 2022, as back-up to another case already scheduled for trial. Gysler posted bond on August 10, 2022, and remained out of custody through the remainder of the proceedings. When Gysler appeared before the court on his conditions of release, the court advised him that his case was its third priority, so if either of the two cases before him proceeded, the matter would continue to the December jury trial term.

¶9     On Friday, September 9, 2022, the State moved to continue the trial because it believed the priority case would proceed to trial. It further explained that the officer witnesses had a training on Monday, September 12, 2022, which they were willing to miss but would like to attend if Gysler's case would not go to trial due to the other matter. The court granted the State's motion and reset trial for Monday, December 12, 2022. On Friday, December 9, 2022, Gysler filed a motion to dismiss for lack of speedy trial. The State opposed the motion and attached an e-mail from Gysler's former attorney that questioned whether Gysler was fit to proceed. The court denied the motion.

---

[1] On appeal, Gysler notes that the MSH report was filed under seal and requests this information be kept confidential on appeal pursuant to M. R. App. P. 10(7). This Opinion generally discusses the evaluation when necessary while respecting his assertion of confidentiality.

5

¶10 Both Officer Garner and Gysler testified at trial, among other witnesses. The State also introduced video evidence, including Officer Garner's body worn camera (which shut off partway through the encounter) and video surveillance from the parking lot. Gysler asserted a self-defense theory and offered a "justifiable use of force" jury instruction. The State requested instructions on resisting arrest and first aggressor. The District Court gave all three requested instructions. The jury found Gysler guilty of assaulting a peace officer. He appeals.

**STANDARDS OF REVIEW**

¶11 On review of a speedy trial ruling, "[w]e review the court's underlying factual findings for clear error." *State v. Velasquez*, 2016 MT 216, ¶ 6, 384 Mont. 447, 377 P.3d 1235 (citation omitted). A finding of fact is clearly erroneous "if it is not supported by substantial credible evidence, if the court misapprehended the effect of the evidence, or our review of the record convinces us that the court made a mistake." *Velasquez*, ¶ 6 (citation omitted). Whether the factual circumstances amount to a speedy trial violation is a question of constitutional law that we review de novo. *State v. Ariegwe*, 2007 MT 204, ¶ 119, 338 Mont. 442, 167 P.3d 815.

¶12 "The district court has broad discretion in formulating jury instructions." *State v. Spotted Eagle*, 2010 MT 222, ¶ 6, 358 Mont. 22, 243 P.3d 402. "We review a district court's decisions regarding jury instructions for abuse of discretion" and ask "whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Wienke*, 2022 MT 116, ¶ 16, 409 Mont. 52, 511 P.3d 990 (citations omitted). "To

6

constitute reversible error, any mistake in instructing the jury must prejudicially affect the defendant's substantial rights." *Wienke*, ¶ 16 (citing *State v. Courville*, 2002 MT 330, ¶ 15, 313 Mont. 218, 61 P.3d 749).

**DISCUSSION**

¶13     *1. Did the pretrial delay violate Gysler's constitutional right to a speedy trial?*

¶14     The Sixth and Fourteenth Amendments of the United States Constitution and Article II, Section 24, of the Montana Constitution guarantee a criminal defendant the right to a speedy trial. *Velasquez*, ¶ 8 (citing *Ariegwe*, ¶ 20). We balance four factors in a speedy trial claim: (1) the length of the delay, (2) the reasons for the delay, (3) the accused's responses to the delay, and (4) prejudice to the accused because of the delay. *Velasquez*, ¶ 8. Each factor's significance varies by case, no one factor is dispositive, and we weigh the factors based on the facts and circumstances of each case. *State v. Kirn*, 2023 MT 98, ¶ 20, 412 Mont. 309, 530 P.3d 1.

**Length of the Delay**

¶15     A pretrial delay of 200 days triggers a speedy trial analysis. *Ariegwe*, ¶ 107. Both parties agree on appeal that the length of delay was 511 days—311 days past the trigger date.[2] This delay is "more than twice the amount of delay that is considered sufficiently prejudicial to trigger the speedy trial test." *Ariegwe*, ¶ 123.

---

[2] The District Court calculated the 511-day delay based on agreement by the parties. On appeal, both parties agree the delay was 511 days but also state that Gysler became accused when arrested on July 17, 2021. A party becomes accused when a person is formally accused, which means by arrest or filing a complaint, indictment, or information. *State v. Chambers*, 2020 MT 271, ¶ 8, 402 Mont. 25, 474 P.3d 1268. By our calculation, the delay is 513 days. Because it is a two-day difference and not disputed on appeal, we will continue to refer to the delay as 511 days.

**Reasons for the Delay**

¶16    We first identify each delay period, "attribute the delay to the responsible party," and assign weight based on the reason for the delay. *Velasquez*, ¶ 13 (citing *State v. Couture*, 2010 MT 201, ¶ 71, 357 Mont. 398, 240 P.3d 987). Delay caused by the State's bad faith weighs most heavily against the State, whereas the prosecution's negligence or lack of diligence occupies a middle ground but is still unacceptable. *Kirn*, ¶ 23. Institutional delays are inherent in the court system, caused by circumstances outside the prosecutor's control, and are attributable to the State, but weigh less heavily. *Velasquez*, ¶ 13 (citing *Couture*, ¶ 72).

¶17    The District Court identified four periods of delay: (1) 207 days from July 19, 2021 (the day that Gysler was formally charged), until February 11, 2022 (the date of the order committing Gysler to MSH for a fitness evaluation); (2) 140 days from February 11, 2022, until July 1, 2022 (the date that Gysler was returned to Flathead County Detention Center from MSH); (3) 73 days from July 1, 2022, until September 12, 2022 (the anticipated trial date); and (4) 91 days from September 12, 2022, until December 12, 2022 (the final trial date). It attributed each of the delays as institutional.

¶18    Gysler argues error in three periods, discussed below. The State counters that most of the delay was institutional and caused by legitimate concerns about Gysler's mental fitness. It asserts further that there is no credible evidence to support any assertion of intentional delay. On appeal, we examine only the time periods that Gysler disputes, as

8

the parties agree otherwise that the remainder of the time is attributed to the State as institutional delay outside its control.

¶19 First, Gysler argues that 65 days from February 22, 2022, to April 28, 2022, should be attributed to the State as negligence because the State never responded to Gysler's motion to set aside the fitness evaluation, and the case sat dormant until the court set the matter for a status hearing two months later. At the status hearing, the State updated the court that MSH anticipated Gysler would be transported within the next two to four weeks. The State stresses the court's statutory duty to order a fitness evaluation if raised by the court, the prosecution, or the defense.

¶20 We held recently that when a defendant seeks a fitness evaluation, "the State is responsible for delay in commencing the evaluation or delivering its results[,]" whereas the defendant is responsible "for the time spent actively completing and reviewing the evaluation." *State v. Allery*, 2023 MT 25, ¶ 22, 411 Mont. 219, 523 P.3d 1088. Unlike in *Allery*, Gysler did not request the evaluation. The court ordered it over his objections, and the delay from the evaluation thus is not attributable to him. When a delay stretches beyond the 60-day statutory window to complete an evaluation due to systemic backlog, it is institutional delay attributable to the State. *Allery*, ¶ 22. Here, the State never responded to Gysler's motion objecting to the evaluation. The delay well may have been outside the State's control due to a waitlist at MSH, but the State never advised the District Court of the status. On the other hand, the record offers no indication that the State's failure to respond to the motion delayed the evaluation or the trial. *State v. Zimmerman*, 2014 MT

9

173, ¶ 15, 375 Mont. 374, 328 P.3d 1132 ("Because the question is one of 'delay,' we are not concerned with actions or events that did not result in a delay of the trial."). A defendant's competency implicates due process concerns, and the court has a duty to order a fitness evaluation if it "has reasonable grounds for concluding that there is a good faith doubt as to the defendant's competency." *State v. White*, 2014 MT 335, ¶ 18, 377 Mont. 332, 339 P.3d 1243. Even so, the State's failure to respond to Gysler's motion until the District Court set a status hearing "falls beneath an acceptable threshold of diligence." *Velasquez*, ¶ 20.[3] The State had until March 14, 2022, to respond to Gysler's February 28 motion. M. R. Civ. P. 6(a); MUDCR 2. We conclude that 45 days from March 14, 2022, to April 28, 2022, is attributable to the State as lack of diligence for failure to respond to Gysler's motion. In the final analysis, however, as explained, this delay in briefing does not materially affect the speedy trial analysis.

¶21   The second period Gysler disputes is 25 days from July 8, 2022, when the fitness evaluation was docketed with the District Court, until August 2, 2022, when the court set the case as a "back-up" for the September jury trial term. Gysler is correct that "[a] defendant is under no obligation to ensure diligent prosecution of the case against him or to help the State avoid dismissal for failure to timely prosecute him." *Zimmerman*, ¶ 18 (citation omitted). Indeed, it is the "prosecutor's constitutional obligation to try the defendant in a timely manner[.]" *Velasquez*, ¶ 18 (citing *Zimmerman*, ¶ 18). In

---

[3] In *Velasquez*, we acknowledged that a state lab backlog likely was beyond the prosecutor's control but held that the State's "failure to even inquire [fell] beneath an acceptable threshold of diligence." *Velasquez*, ¶ 19. Similarly here, the State's failure to respond to the motion—whether or not it affected Gysler's bed date at MSH—lacked diligence.

*Zimmerman*, the case fell off the court's calendar and went into "a state of limbo." *Zimmerman*, ¶ 17. In Gysler's case, the District Court's minute entry from April 28, 2022, states that the "Court directs [defense counsel] to notify the Court once the Defendant's mental evaluation is complete." Although the State generally must ensure diligent prosecution, the facts here are distinguishable from *Zimmerman* because Gysler was under specific instructions to notify the court once the evaluation was complete. We agree that this time was institutional delay.

¶22 Last, Gysler argues that the 93-day delay between September 10, 2022, when the court granted the State's motion to continue the trial, and December 12, 2022, was intentional. The State argues that the District Court, familiar with its own calendar, shared the State's genuine belief that the first-setting matter would proceed. Gysler's speedy trial motion argued that the court granted the State's motion to continue *after* it had resolved the priority case—all on the same Friday afternoon. In its order denying the motion, the District Court found that the September 12, 2022 trial setting was the second matter and there was a genuine belief that the first setting would go to trial. It concluded that the State's motion was not an intentional attempt to delay the proceedings. The District Court's determination that the delay was institutional was based on its factual finding of a genuine belief that the priority matter would go to trial. Gysler must show clear error on appeal. *Zimmerman*, ¶ 11. Absent this showing, this Court will not read an intentional or negligent delay into a series of events all occurring within the same afternoon.

11

¶23 We affirm the District Court's order attributing most of the delay as institutional. We agree with Gysler, however, to the extent that 45 days during which the State was obligated but failed to respond to his motion was lack of diligence. The remainder of the time (466 days) is attributable to the State as institutional delay that was outside its control. Unlike in *Velasquez* (where the State's negligence weighed heavily in finding a speedy trial violation), most of the delay here was institutional. *Velasquez*, ¶¶ 51-53.

¶24 Factor One demands that the longer the delay stretches past the 200-day mark, the higher the State's burden to justify the delay under Factor Two. *Ariegwe*, ¶ 62. A long waitlist for beds does not vitiate a defendant's constitutional right to a speedy trial. *E.g., Allery*, ¶ 32 (holding that a defendant's speedy trial rights were violated after experiencing extensive institutional delays, in part because of various commitments to MSH).

¶25 On the other hand, as the State points out, a "trial court has a *sua sponte* duty to order a fitness determination 'if the court has reasonable grounds for concluding that there is a good faith doubt as to the defendant's competency.'" *White*, ¶ 18 (quoting *State v. Bartlett*, 282 Mont. 114, 120, 935 P.2d 1114, 1117 (1997)). "Section 46-14-202, MCA, does not require that the defendant must agree to a mental examination." *State v. Bartlett*, 271 Mont. 429, 432, 898 P.2d 98, 100 (1995). If the issue of the defendant's fitness to proceed is raised by the district court, prosecution, or defense counsel, "the court '*shall*' arrange for such an examination. The word 'shall' is compulsory." *Bartlett*, 271 Mont. at 432, 898 P.2d at 100; § 46-14-202, MCA.

¶26 Though Gysler disputes the court's decision to direct a fitness evaluation as unnecessary, he does not challenge that order on appeal. We thus do not analyze whether the District Court erred in ordering the evaluation but assume for speedy trial purposes that it was appropriate. We also note that Gysler's fitness was raised by his former private attorney, by the prosecution, and by the District Court and was mentioned by family members in police reports. In *Allery*, examining a pretrial delay of 1,179 days, we observed that the defendant "remained detained for more than three years, spending much of this time in jail pending evaluation" (he waited eight months in detention for the first commitment) or "decompensating when he was prematurely returned [to jail] to free up MSH bedspace" against his evaluator's advice—thus necessitating another commitment to MSH. *Allery*, ¶¶ 4, 9, 32. Unlike in *Allery*, of the 511-day delay (including the time he was at MSH), Gysler spent 266 days in jail, much of which was caused by violating his release conditions. Considering all the circumstances, Factor Two weighs slightly against the State; even though we attribute 45 days of delay to the State's lack of diligence, there is no record indication that this relatively minor period delayed the evaluation or the trial, and the State has justified the remaining institutional delay due to the court's statutory duty to request a fitness evaluation and the corresponding due process concerns of a defendant's fitness to proceed.

**Accused's Response to the Delay**

¶27 "We evaluate [based on a totality of the circumstances] the accused's responses to the delay to determine whether he 'actually wanted a speedy trial, which in turn informs

13

the inquiry into whether there has been a deprivation of the right.'" *Allery*, ¶ 29 (quoting *Ariegwe*, ¶ 110).

¶28 The District Court reasoned that Gysler could have asserted the right earlier, "permitting the substance of the motion to be fully addressed." Gysler argues that he unequivocally advocated for a speedy trial to both the court and MSH staff throughout the proceedings. Analogizing to *Allery*, Gysler argues that the District Court erred in not assigning this weight. The State responds that Gysler first asserted a speedy trial right violation during a "nonsensical rant" at the April 28 status hearing but did not file a formal motion to dismiss for lack of speedy trial until one business day before his jury trial began. The State argues that this is inconsistent with a genuine concern to proceed to trial.

¶29 We find *Allery* analogous. "Allery wrote numerous pro se letters invoking his speedy trial right and voiced his displeasure with the delay to MSH evaluators[,]" but the court did not mention "Allery's explicit complaints about the delay he experienced." *Allery*, ¶ 29. Gysler's attorney cited speedy trial concerns in his February 2022 motion to vacate the evaluation and reset the matter for trial. The transcripts from the April 28 hearing show that defense counsel requested an expedited trial in the next two weeks and stated, "I am ready. Mr. Gysler is ready. And we do not think that delaying this matter any further, to having him detour at the State Hospital is necessary." After the evaluation was complete, it was Gysler who moved the court to set the case for trial again. Still, Gysler may have contributed to some delay by his failure to advise the court whether his mental health expert completed the evaluation.

14

¶30 The timing of Gysler's speedy trial motion, the Friday before trial was set to begin, is "one consideration among many[.]" *Ariegwe*, ¶ 140 n.11. Gysler was aware three months earlier that his trial was reset for December 2022 but waited until the business day before trial to file the motion. Despite this late filing, Gysler and his attorney did voice concern earlier in the proceedings "about the length of time it was taking to get to trial," indicating that he "actually wanted" a speedy trial. *Allery*, ¶ 29. We conclude that Factor Three weighs slightly in Gysler's favor.

**Prejudice to the Accused**

¶31 "Under Factor Four, we consider whether the delay prejudiced the accused 'in light of the interests that the speedy trial right was designed to protect: (i) preventing oppressive pretrial incarceration, (ii) minimizing anxiety and concern caused by the presence of unresolved criminal charges, and (iii) limiting the possibility that the accused's ability to present an effective defense will be impaired.'" *Velasquez*, ¶ 27 (citing *Zimmerman*, ¶ 28).

¶32 Acknowledging that the longer delay created a heavier burden on the State to demonstrate a lack of prejudice, the District Court noted that "the accused is not relieved of presenting evidence of prejudice." The court concluded that Gysler was not prejudiced because "he was given two opportunities to remain in the community on pretrial conditions of supervision and both times was found to have violated those conditions by engaging in new criminal conduct." Gysler does not dispute this finding but relies on the highly persuasive showing the State must make due to the 511-day delay. *Kirn*, ¶ 21.

15

### i. Oppressive Pretrial Incarceration

¶33 "The right to a speedy trial is not intended to prevent all pretrial incarceration. It is designed to prevent oppressive pretrial incarceration." *State v. Spang*, 2007 MT 54, ¶ 14, 336 Mont. 184, 153 P.3d 646 (citation omitted). In assessing whether a defendant's pretrial incarceration was oppressive, we consider the duration, the complexity of the charge, and any misconduct by the defendant "directly related to the pretrial incarceration." *Ariegwe*, ¶¶ 90-92.

¶34 Citing this Court's recognition of the stigma and effects of a civil commitment, Gysler asserts that an evaluation at MSH is inherently invasive and argues that the unnecessary evaluation violated his privacy rights and right to dignity. He also stresses the related 266 days in pretrial custody.[4] The State counters that Gysler has not provided specific evidence to demonstrate oppressiveness and reiterates the District Court's findings that Gysler was incarcerated pretrial for violating his release conditions.

¶35 We concluded in *Velasquez* that the defendant suffered oppressive incarceration when jailed for ten months on a non-violent drug possession charge because he could not meet the $5,000 bail condition. *Velasquez*, ¶¶ 34-35. Velasquez could not step outside for

---

[4] Gysler further asserts that he was prejudiced because the District Court used the MSH evaluation against him in analyzing the speedy trial claim. In its order denying his speedy trial motion, the court used findings from the evaluation to determine that Gysler engaged in inappropriate behavior when evaluating Factor Two (reasons for the delay). We agree with Gysler that the District Court improperly used findings from the evaluation—the purpose of which was to determine his fitness for trial—against him in evaluating prejudice in his speedy trial motion. *See* § 46-14-101, MCA (discussing when information gained from examination of the defendant regarding their condition is applied). Even excluding this reference, it was not the primary basis of the District Court's reasoning, and it is not material to our analysis.

months, suffered lung issues from black mold, and had limited access to clean drinking water or contact with his family. *Velasquez*, ¶ 34. In *Zimmerman*, we held that the expense and effect on a person's lifestyle and freedom of movement from an ankle monitor "constituted an impairment of . . . liberty" that supported a prejudice claim when it cost him over $2,000 and limited his work. *Zimmerman*, ¶¶ 8, 30-31.

¶36 Unlike the defendants in *Zimmerman* or *Velasquez*, Gysler did not present evidence to support a claim that his time at MSH or in pretrial detention was oppressive. *Zimmerman*, ¶ 33; *Velasquez*, ¶ 34. Gysler's reference to the stigma and negative consequences of a civil commitment is of little significance when he has not challenged the fitness evaluation on appeal. And he has not articulated how the general procedures that MSH followed in his evaluation could show oppressiveness. Other than the period during his evaluation, Gysler was released pretrial except when his misconduct resulted in his return to incarceration. Finally, after the evaluation was completed and he posted bond on August 10, 2022, Gysler remained out of jail until trial. Though the simplicity of the charge weighs in his favor, *Ariegwe*, ¶ 91, Gysler has not persuaded us that the time he spent in pretrial detention was oppressive.

### ii. The Accused's Anxiety and Concern

¶37 "A certain amount of anxiety and concern is inherent in being accused of a crime." *Zimmerman*, ¶ 32. "[T]he critical question is whether the delay in bringing the accused to trial *unduly prolonged* the disruption of his life or *aggravated* the anxiety and concern that

17

are inherent in being accused of a crime." *Zimmerman*, ¶ 32 (citing *Couture*, ¶ 64; *Ariegwe*, ¶ 97).

¶38    Gysler emphasizes the unnecessary delays caused by the fitness evaluation. He cites § 46-14-103, MCA (the statute defining when a person is unfit to proceed due to a mental disease or disorder), *In re G.T.M.*, and *State v. Garner* to dispute the necessity of the court's competency determinations. *In re G.T.M.*, 2009 MT 443, 354 Mont. 197, 222 P.3d 626; *State v. Garner*, 2001 MT 222, 306 Mont. 462, 36 P.3d 346. Unlike in *Garner* and *In re G.T.M.*, where the court's competency determination was squarely at issue on appeal, Gysler does not directly challenge the District Court's decision to get a fitness evaluation. *In re G.T.M.*, ¶ 4; *Garner*, ¶ 18. As discussed above, for purposes of the speedy trial evaluation, we assume its propriety.

¶39    In *Daly*, we reasoned that "the defendant did not request an evidentiary hearing on his speedy trial motion" and thus failed to provide evidence on this interest. *State v. Daly*, 2023 MT 142, ¶ 32, 413 Mont. 100, 533 P.3d 326. Here too, Gysler did not request an evidentiary hearing. Outside his arguments that the fitness evaluation was improper, the record does not show how the delay aggravated any anxiety or unduly prolonged the disruption in his life.

### iii.    Impairment of the Defense

¶40    Preventing an impaired defense "constitutes the most important factor in the prejudice analysis." *Zimmerman*, ¶ 36. Gysler makes no argument that his defense was impaired. The State argues there was no impairment to the defense because the incident

18

was captured on parking garage surveillance video and partially on the officer's body-worn camera, and Gysler—without recollection issues—was the only witness to testify that he acted in self-defense. We conclude from the record presented that Gysler's defense was not impaired.

¶41 Because of the 511-day delay, the State has a higher burden to overcome the presumption of prejudice, while Gysler's burden is lower. *Kirn*, ¶ 21. We are not convinced that Gysler was prejudiced by the delay. Though the long delay means the quantum of proof that he needed to present was lower, it was not zero. *See Daly*, ¶ 36 (reasoning that although "there may be cases where the absence of prejudice will not defeat a speedy trial claim, those cases will be few and far between"). Unlike our finding of prejudice in *Allery*, ¶ 31, the State has overcome the strong presumption in this case: Gysler did not suffer oppressive pretrial incarceration, as he was released for half of the delay and it was his own misconduct that caused the periods he was detained in the county jail; the delay did not unduly prolong his anxiety, as it was within the District Court's statutory duty to require a fitness evaluation; and our review of the record does not show any impairment of the defense. Factor Four weighs against finding a speedy trial violation.

**Balancing**

¶42 To conclude its speedy trial analysis, the Court balances the four factors and considers them with other relevant circumstances. *Daly*, ¶ 35. Factor Three weighs slightly in Gysler's favor because although he did not follow through with the court on the promised defense mental evaluation or move to dismiss until the day before trial, he

asserted his speedy trial right throughout the proceedings. Under Factor Two, 45 days were attributable to the State's lack of diligence, but most of the delay was institutional, caused in part by the fitness evaluation and the District Court's uncontested authority to order such an evaluation. Contrary to Gysler's attempted analogy, we find *Zimmerman* distinguishable. Unlike in *Zimmerman*, where over half of the delay was caused by the government's lack of diligence, most of the delay here was institutional. *Zimmerman*, ¶ 21. Also unlike *Zimmerman*, we have found no prejudice under Factor Four. *Zimmerman*, ¶¶ 31, 34. The lack of prejudice, coupled with the District Court's obligation to ensure that Gysler was fit to proceed, lead this Court to conclude on balance that his speedy trial right was not violated.

¶43    2. *Did the District Court err in instructing the jury on resisting arrest when Gysler was not charged with that offense?*

¶44    In the alternative, Gysler argues that he is entitled to a new trial because the District Court erred in instructing the jury in accordance with § 45-3-108, MCA, that he could not use force to resist arrest because he was not charged with resisting and the instruction conflicted with his claim of self-defense.

¶45    A person may assert justifiable use of force, as defined in § 45-3-102, MCA, when charged with assaulting a police officer. *Courville*, ¶ 35. The State tried Courville before a jury on two counts of felony assault on a police officer and one count of felony criminal endangerment. *Courville*, ¶¶ 12-13. Courville asserted a self-defense theory. *Courville*, ¶ 28. The trial court instructed the jury on the defense of justifiable use of force (based on § 45-3-102, MCA) but also instructed that a person cannot use force to resist arrest (based

20

on § 45-3-108, MCA). *Courville*, ¶ 29. Courville argued that the court erred because, first, the charge of resisting arrest was not presented to the jury and, second, giving the resisting-arrest instruction with the self-defense instruction confused the jury and essentially nullified his self-defense theory. *Courville*, ¶¶ 42, 44. We held that neither instruction nullified the other or created confusion, and the jury was properly instructed on the relevant law "to guide their deliberations" on whether the defendant had a reasonable belief that he needed to defend himself. *Courville*, ¶¶ 42-44.

¶46 Gysler's counsel argued that the instruction on resisting arrest was not required under *Courville* and would be inappropriate because, as Gysler was not charged with resisting arrest, the instruction would mislead the jury. The District Court acknowledged that the instruction could be confusing but concluded that it was consistent with *Courville* and fit with the facts presented at trial.

¶47 The court instructed Gysler's jury:

> A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force. However, a person is justified in the use of force which is intended or likely to cause death or serious bodily harm only if he/she reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to himself or the commission of a forcible felony.

The instruction on resisting arrest read:

> A person is not authorized to use force to resist an arrest that the person knows is being made by a peace officer, even if the person believes that the arrest is unlawful and the arrest in fact is unlawful.

¶48 Gysler argues that *Courville* is distinguishable because the defendant in *Courville* pleaded guilty to resisting arrest prior to trial and the officer there suffered more extensive

injuries, whereas Gysler truly only initiated self-defense moves after he reasonably believed that he was in danger (not in response to an illegal arrest). *Courville*, ¶¶ 11, 44. He highlights the dissent in *Courville*, which would have found error to give both the resisting arrest instruction and a self-defense instruction. *Courville*, ¶¶ 52-55 (Trieweiler, J., dissenting).

¶49 The State analogizes to *Courville*, arguing that Gysler's testimony and his self-defense theory were submitted to the jury with other witness testimony and evidence, including videos of the incident. The State maintains that the jury, in its exclusive province of weighing the evidence, "did not believe that in effecting Gysler's arrest, Officer Garner was using unlawful force that would have justified [a] reasonable belief that he needed to defend himself from imminent harm." Pointing to Gysler's testimony and the defense's closing arguments, the State argues that Gysler's ability to argue his self-defense theory was not nullified.

¶50 We find *Courville* dispositive. The two instructions in *Courville* are almost identical to the instructions in this case. *Courville*, ¶ 29. More so, the arguments Gysler raises (that the instruction confused the jury, nullified his defense, and was improper considering he was not formally charged with resisting arrest) are essentially the same raised and rejected in *Courville*. *Courville*, ¶¶ 42, 44. Analyzing the overlap of §§ 45-3-102 and -108, MCA, we determined that "one cannot use force to resist arrest, but one can use force to defend himself if he reasonably believes that such conduct is necessary" against an officer's imminent use of unlawful force. *Courville*, ¶ 37. An officer must use only the force

22

necessary to make an arrest. *Courville*, ¶ 38; § 46-6-104(2), MCA. "Where the claim is that a peace officer used unlawful force in executing an arrest and the person subject to restraint reasonably believed that he must defend himself against the imminent use of this unlawful force, then the resolution of those conflicting claims is properly left to the jury." *Courville*, ¶ 39.

¶51 Although Gysler was not charged with resisting arrest, no resisting arrest charge was presented to the jury in *Courville*, either. *Courville*, ¶ 12. The factual differences that Gysler highlights do not impact the question here—whether sufficient evidence existed on these facts to instruct the jury and whether the instruction was legally correct. *Spotted Eagle*, ¶ 6. The extent of the officer's injuries goes to the reasonableness and necessity of the force used in self-defense, which are questions left to the jury as the trier of fact.[5]

¶52 How to instruct the jury in a given case is a discretionary determination left to the trial judge. *Courville*, ¶ 15. The instructions here fully and fairly instructed the jury on the applicable law. *Courville*, ¶ 15. The record shows that the District Court gave this instruction because it found that the facts presented at trial created a relevant question for the jury. As we stated in *Courville*, "the claim of self defense in justification of one's conduct is always considered within context and circumstances of the specific event at issue so that the fact-finder may determine whether the accused's belief is reasonable." *Courville*, ¶ 40. Like in *Courville*, the jury heard testimony from Gysler and from Officer

---

[5] Gysler also cites to *State v. Laughlin*, 281 Mont. 179, 933 P.2d 813 (1997), where the defendant was charged with assault, to highlight numerous factual differences and show that the record does not support that Gysler tried to resist arrest. Factual differences in *Laughlin* do not negate that the record in Gysler's case supported the instruction.

23

Garner and saw video of the incident. *Courville*, ¶ 40. "Based on this evidence, the jury chose not to believe" Gysler and did not believe that, in effecting the arrest, the officer "was using unlawful force that would have justified [a] reasonable belief that [Gysler] needed to defend himself from imminent harm." *Courville*, ¶ 40. In other words, the jury did not believe Gysler's "need for self defense was reasonable." *Courville*, ¶ 44. The conflicting evidence supported the jury instructions, and the trial court did not abuse its discretion when it gave both instructions. *Wienke*, ¶ 16.

¶53    *3. Did the District Court improperly instruct the jury on justified use of force when it gave a first-aggressor instruction?*

¶54    "[A] district court must instruct the jury on theories and issues that are" supported by direct or circumstantial evidence at trial. *State v. Polak*, 2018 MT 174, ¶ 25, 392 Mont. 90, 422 P.3d 112 (citing *State v. Erickson*, 2014 MT 304, ¶ 35, 377 Mont. 84, 338 P.3d 598). "[W]hen conflicting evidence is presented, the district court must provide jury instructions on both theories supported by the evidence." *Polak*, ¶ 25 (citing *State v. Kaarma*, 2017 MT 24, ¶ 25, 386 Mont. 243, 390 P.3d 609). A court may give a "first-aggressor" instruction if a "rational trier of fact could find from the evidence that a defendant purposefully or knowingly provoked force[.]" *Polak*, ¶ 27. Because evidentiary weight and witness credibility are exclusively within the province of a trier of fact, "it is the jury's 'prerogative to accept or reject a defendant's claim of self-defense.'" *Polak*, ¶ 28 (quoting *State v. Miller*, 1998 MT 177, ¶ 25, 290 Mont. 97, 966 P.2d 721).

¶55    The court gave the jury a first-aggressor instruction, based on § 45-3-105, MCA:

The use of force in defense of a person is not available to a person who purposely or knowingly provokes the use of force against himself unless such

24

force is so great that he reasonably believes that he is in imminent danger of death or serious bodily harm and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or serious bodily harm to the assailant.

¶56 Gysler argues that this instruction was improper because it was unsupported by the evidence, created confusion, and—because the incident was captured on video—no conflicting evidence existed as to what occurred before Officer Garner knocked him to the ground. Gysler asserts that the video evidence shows that at no time did Gysler show aggression towards Officer Garner. He further argues that issuing such an instruction without supporting facts diminishes his defense and "the State's burden to prove lack of justifiable use of force under the correct standard beyond a reasonable doubt." The State counters that the facts of this case included conflicting testimony, including whether Gysler's use of force on a peace officer was reasonable, and the court's decision to give the instruction did not constitute an abuse of discretion.

¶57 In *State v. Polak*, the defendant asserted a justified use of force defense. *Polak*, ¶ 11. On appeal, Polak argued that the "District Court abused its discretion by giving a 'first-aggressor' instruction despite insufficient evidence[.]" *Polak*, ¶ 30. We reasoned that the court did not abuse its discretion because the weight of evidence and witness credibility are within the jury's province, a district court may give a first-aggressor instruction if a rational trier of fact could find from the evidence that a defendant purposefully or knowingly provoked the force, and there was sufficient evidence and conflicting testimony presented at trial. *Polak*, ¶¶ 27-31.

¶58 First, like in *Polak*, there was sufficient evidence to justify the "first-aggressor" instruction. *Polak*, ¶ 31 (citations omitted). Evidence included videos and testimony from both Gysler and Officer Garner. Gysler testified that Officer Garner approached him aggressively, that the officer communicated in a confrontational manner, and that Gysler was scared and trying to de-escalate the situation. Officer Garner testified that Gysler demonstrated escalating emotional and aggressive behavior, did not comply with his requests, and that it was not his intention or desire to make physical contact in such a manner with Gysler, hurt him, or engage in any fight. Gysler's argument that "at no time did [he] make aggressive moves or statements toward" Officer Garner presents a factual determination that is properly left to the jury. Like this statement, much of Gysler's argument is premised on the idea that there is only one reasonable interpretation or finding to be drawn from the videos. But Gysler overlooks that the videos are open to multiple interpretations and did not capture the full scene, and he ignores the conflicting testimony provided by Gysler and Officer Garner. Having reviewed the videos and testimony, this Court is not convinced that "no rational trier of fact" could find from the evidence that Gysler did not purposefully or knowingly provoke the force. *Polak*, ¶ 27. Because the State's theory found support in the evidence, the trial judge had a "duty to instruct the jury[.]" *Erickson*, ¶ 35. It was the jury's exclusive province to consider all the evidence and determine its weight in deciding whose version of events to believe. *Polak*, ¶ 28.

¶59 Second, because sufficient evidence existed to warrant a "first-aggressor" instruction, Gysler's argument that the instruction diminished his defense or the State's

26

burden necessarily fails. The case law that Gysler cites to support this argument is from other states and not binding on this Court. Montana precedent accepts "first-aggressor" instructions—assuming sufficient evidence was presented at trial—when the defendant asserted a justifiable use of force claim. *E.g. Polak*, ¶ 32; *Erickson*, ¶ 35.

¶60    Because sufficient evidence supported the instruction and the video evidence did not conclusively support Gysler's theory of the case, the District Court did not abuse its discretion.

## CONCLUSION

¶61    The District Court's judgment is affirmed.

/S/ BETH BAKER

We concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ JIM RICE

Chief Justice Cory J. Swanson, concurring.

¶62    I concur with the Majority Opinion, but write separately to disagree with the holding that 45 days of the delay are attributed to the State for lack of diligence.

¶63    Once the issue of a defendant's mental fitness is raised by either party or the district court, the issue must be decided after, at a minimum, a mental health evaluation and report submitted to the court. Section 46-14-221(1), MCA. Defense counsel's effort to speed

27

things along by filing a motion to undo the court's raising of the fitness issue, and subsequent order of a mental evaluation, was correctly denied. Defense counsel's other effort to speed things along, by hiring a local evaluator, fizzled out for reasons unexplained by the record. It appears the State did its job in moving this case toward trial, while protecting Gysler's constitutional right to a fair trial, including being mentally fit to understand the proceedings and assist with his defense.

¶64 So how exactly did the State negligently delay Gysler's mental evaluation and trial by 45 days? There is no factual support in the record that the State's failure to respond to Gysler's unlawful motion to reverse the order for a fitness evaluation contributed in any way to the delay. That is not just my view, it is the Majority Opinion: "[T]he record offers no indication that the State's failure to respond to the motion delayed the evaluation or the trial." Opinion, ¶ 20. And there certainly is no evidence to hold the District Court was clearly erroneous in finding this period was institutional delay "beyond the control of the State."

¶65 So if the delay was not attributed to the State's failure to respond to the motion, why have we attributed 45 days of delay to the State's negligence? We are merely commenting on our disapproval that the State did not file a timely response to a defense motion, which was contrary to statute. That should be handled by the District Court, or at most, a disapproving footnote. Instead, our comment on a response motion will instruct district courts to allocate delay to parties when in fact they did not cause the delay. There is no

basis whatsoever for the Dissent's view that the State was negligent and this delay was material.

/S/ CORY J. SWANSON

Justice Katherine Bidegaray, dissenting.

¶66     I respectfully dissent from the majority's holding on Issue 1 regarding the violation of Gysler's constitutional right to a speedy trial. The majority correctly applies the four-factor balancing test articulated in *State v. Ariegwe*, 2007 MT 204, ¶ 113, 338 Mont. 442, 167 P.3d 815. However, the majority significantly miscalculates the substantial prejudice caused by the lengthy delay and inadequately assesses the State's negligent conduct, which heavily weighs toward concluding that Gysler's speedy trial rights were violated.

¶67     Gysler experienced a substantial 511-day delay from his initial charge to trial, a period well beyond the presumptive threshold of 200 days that triggers closer scrutiny under *Ariegwe*. *See Ariegwe*, ¶ 41. The majority acknowledges this length but undervalues the significance and gravity of the State's lack of due diligence—particularly the critical 65-day period during which the State entirely failed to respond to Gysler's objection regarding the mental health evaluation. This failure directly contravened the State's duty to ensure diligent prosecution and timely responses to defense motions, exacerbating delay and prejudice.

¶68     The majority characterizes this period of delay as merely institutional, overlooking the specific and demonstrable lack of State responsiveness and due diligence. In *State v.*

29

*Velasquez*, 2016 MT 216, ¶ 13, 384 Mont. 447, 377 P.3d 1235, we clearly recognized that a delay resulting from the State's inaction or neglect substantially weighs against it. The State's unexplained 65-day silence plainly constitutes negligent inaction, compellingly increasing the weight of delay against the State under the second *Ariegwe* factor. The majority's characterization of this delay as "slight" fails to reflect accurately the duty imposed upon the State to prosecute diligently.

¶69   Furthermore, the majority inadequately considers the inherent prejudice caused by Gysler's involuntary commitment to Montana State Hospital (MSH) for a mental fitness evaluation. Forced institutionalization inherently compounds the oppressive nature of pretrial incarceration, significantly implicating a defendant's liberty and dignity interests. Contrary to the majority's characterization, Gysler suffered substantial prejudice: prolonged incarceration, forced separation from family, and involuntary confinement at MSH constitute significant, oppressive burdens, not mere inconveniences. The majority opinion fails to confront these severe consequences adequately, trivializing the seriousness of such State-imposed constraints on liberty.

¶70   Moreover, the constitutional guarantee of a speedy trial is not merely procedural—it safeguards fundamental liberties and dignity inherent to our criminal justice system. Administrative convenience or generalized institutional explanations cannot overcome substantial prejudice where the State, through neglect or inaction, directly contributes to oppressive delays. The State's duty to secure a mental competency evaluation under § 46-14-202, MCA, does not relieve it from promptly addressing defense objections and

motions. Thus, the majority's reliance on the mandatory nature of the evaluation statute, without considering prosecutorial diligence, is misplaced.

¶71 The majority's approach today inadvertently lowers the bar for State accountability in speedy trial contexts, allowing institutional inefficiency and prosecutorial inattentiveness to justify significant infringements on individual liberty. We must reaffirm that defendants should not bear the heavy burdens of prolonged incarceration and involuntary mental health commitments caused primarily by State negligence or disregard.

¶72 In balancing the four *Ariegwe* factors properly—with appropriate weight given to the State's clear negligence and the substantial prejudice Gysler endured—I conclude Gysler's constitutional speedy trial rights were violated. Therefore, I would reverse the District Court's denial of Gysler's motion to dismiss based upon the speedy trial violation and remand with instructions to dismiss the charges with prejudice.


/S/ KATHERINE M BIDEGARAY


Justice Ingrid Gustafson joins in the dissenting Opinion of Justice Katherine Bidegaray.


/S/ INGRID GUSTAFSON